**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MICHAEL CLANCY, STUART LOVE, THOMAS BRYANT, JAMES PETERS, and SAMUEL PATTON, on behalf of themselves and all others similarly situated,<br><br>                Plaintiffs,<br><br>      v.<br><br>THE SALVATION ARMY, an Illinois nonprofit corporation,<br><br>                Defendant. | Civil Action No. 1:22-cv-01250<br><br>Honorable Manish S. Shah<br><br>**PUBLIC VERSION** |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
THE SALVATION ARMY, AN ILLINOIS NONPROFIT CORPORATION'S
MOTION FOR SUMMARY JUDGMENT
<u>PURSUANT TO FED. R. CIV. P. 56</u>**

# TABLE OF CONTENTS

Table of Authorities ............................................................................................................ ii

INTRODUCTION ...............................................................................................................1

FACTUAL BACKGROUND ...............................................................................................3

LEGAL STANDARD .........................................................................................................18

ARGUMENT .....................................................................................................................18

I.       Beneficiaries Are Not Employees Under the FLSA. ........................................... 18

II.      Courts and Administrative Tribunals Have Consistently Found That ARC Beneficiaries Are Not Employees. ..................................................................................................... 25

III.    The Economic Reality of the ARC Reflects a Rehabilitative Relationship Between Beneficiary and Benefactor; Not Employee and Employer. ............................................. 29

        A.      An Objective Evaluation of the ARC Program as a Whole Confirms That Beneficiaries Are Not Employees Under the FLSA. ............................................. 31

        B.      Plaintiffs Were the Primary Beneficiaries of Their Relationship with TSA. ....... 32

        C.      Plaintiffs Had no Expectation of Compensation in Enrolling in a Rehabilitation Program. ........................................................................................................... 41

        D.      In Contrast to Alamo, Plaintiffs Were Dependent on TSA Only for the Limited Duration of Their Rehabilitative Journey. ............................................................ 47

IV.    The ARCs Operate at a Deficit. ....................................................................... 49

V.     The Subjective Experiences of Plaintiffs, Presented in Litigation, Do Not Create a Genuine Issue of Material Fact Regarding the Primary Beneficiary Issue. ..................... 51

VI.    Plaintiffs' State Law Claims Fail for the Reasons Discussed Above. ............................. 54

VII.   Plaintiffs Cannot State a Claim That TSA Willfully Violated the FLSA. ........................ 56

CONCLUSION ..................................................................................................................56

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acker v. The Salvation Army, a New York Corp.*,
No. 1:22-cv-01968 (S.D.N.Y., filed July 9, 2022)................................................26

*Acosta v. Cathedral Buffet, Inc.,*
887 F.3d 761 (6th Cir. 2018) ............................................................................23

*Armento v. Asheville Buncombe Cmty. Christian Ministry, Inc.,*
856 F. App'x 445 (4th Cir. 2021) ......................................................................23

*Armour & Co. v. Wantock,*
323 U.S. 126 (1944)..........................................................................................22

*Bennett v. Frank,*
395 F.3d 409 (7th Cir. 2005) ............................................................................21

*Berger v. Nat'l Collegiate Athletic Ass'n,*
843 F.3d 285 (7th Cir. 2016) ................................................................. *passim*

*Brant v. Schneider Nat'l, Inc.,*
43 F.4th 656 (7th Cir. 2022)..............................................................................55

*Brooklyn Sav. Bank v. O'Neil,*
324 U.S. 697 (1945)..........................................................................................24

*Callahan v. City of Chicago,*
78 F.Supp.3d 791 (N.D. Ill. 2015), *aff'd,* 813 F.3d 658 (7th Cir. 2016) ...................18, 22, 54

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986)..........................................................................................18

*Clancy v. Salvation Army,*
No. 22 CV 1250, 2023 WL 1344079 (N.D. Ill. Jan. 31, 2023).....................33, 54, 56

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.,*
603 U.S. 799 (2024)....................................................................................19, 20

*Dikker v. 5-Star Team Leasing, LLC,*
243 F.Supp.3d 844 (W.D. Mich. 2017) ............................................................54

*Doe I v. Univ. of Illinois,*
No. 18-CV-2227, 2018 WL 11507775 (C.D. Ill. Dec. 21, 2018) ............................32

*Donovan v. Tony & Susan Alamo Found.*,
567 F. Supp. 556 (W.D. Ark. 1982), *modified*, No. CIV. 77-2183, 1983 WL
1982 (W.D. Ark. Feb. 7, 1983), *and aff'd in part, vacated in part*, 722 F.2d
397 (8th Cir. 1983), *aff'd sub nom. Tony & Susan Alamo Found. v. Sec'y of
Lab.*, 471 U.S. 290 (1985) ..................................................................48

*Doyle v. City of N.Y.*,
91 F. Supp. 3d 480 (S.D.N.Y. 2015) .................................................23

*Fochtman v. Hendren Plastics, Inc.*,
47 F.4th 638 (8th Cir. 2022) ..........................................................28, 47

*Freeman v. Key Largo Volunteer Fire & Rescue Dep't, Inc.*,
494 F. App'x 940 (11th Cir. 2012) ...................................................23

*Glatt v. Fox Searchlight Pictures, Inc.*,
811 F.3d 528 (2d Cir. 2016) ......................................................23, 32, 34

*Guevara v. I.N.S.*,
902 F.2d 394 (5th Cir. 1990) ...........................................................23

*Harris v. Salvation Army*,
No. 23-cv-61420, 2025 U.S. Dist. LEXIS 56347 (S.D. Fla. Mar. 26, 2025) ..................*passim*

*Haynes v. Tru-Green Corp.*,
154 Ill. App. 3d 967, 507 N.E.2d 945 (1987) ...................................54

*Hollins v. Regency Corp.*,
867 F.3d 830 (7th Cir. 2017) ......................................................23, 24, 33

*State ex rel. Hung Nam Tran v. Speech*,
782 N.W.2d 106 (Wis. Ct. App. 2010) .............................................55

*Isaacson v. Penn Cmty. Servs., Inc.*,
450 F.2d 1306 (4th Cir. 1971) .........................................................23

*Jackson v. Blitt & Gaines, P.C.*,
833 F.3d 860 (7th Cir. 2016) ...........................................................20

*Johnson v. Salvation Army*,
2011 IL App (1st) 103323, 957 N.E.2d 485 (2011) ..........................28

*Massey v. The Salvation Army, a Georgia Corp.*,
No. 1:22-cv-1250 (N.D. Ga., filed July 9, 2022) ...........................26, 27

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ........................................................................18

*McKinney v. Castleman,*
    2012 IL App (4th) 110098, 968 N.E.2d 185 (2012) ................................................28

M*c*Kinney v. The Salvation Army,
    No. 08-WC-41928 (Ill. Workers' Compensation Commission, Feb. 2, 2009) ......................29

*McLaughlin v. Richland Shoe Co.,*
    486 U.S. 128 (1988) ................................................56

*Ndambi v. CoreCivic, Inc.,*
    990 F.3d 369 (4th Cir. 2021) ................................................23

*Pope v. The Salvation Army,*
    No. 2002-40978 (N.J. Work. Comp. Bd. 2007) ................................................29

*Randy Lynn Oaks v. Salvation Army*, IC 90-713791 at 24 ................................................29

*Reed v. Brex, Inc.,*
    8 F.4th 569 (7th Cir. 2021) ................................................25

*Sanders v. Hayden,*
    544 F.3d 812 (7th Cir. 2008) ................................................55

*Schumann v. Collier Anesthesia, P.A.,*
    803 F.3d 1199 (11th Cir. 2015) ................................................23, 32

*Solis v. Laurelbrook Sanitarium & Sch., Inc.,*
    642 F.3d 518 (6th Cir. 2011) ................................................23

*Spilman v. The Salvation Army,*
    No. CGC-21-591364 (Cal. Super. Ct. Sept. 28, 2023), *appeal pending* ......................... *passim*

*Steelman v. Hirsch,*
    473 F.3d 124 (4th Cir. 2007) ................................................23

*Strzykalski v. Bd. of Educ. of Summit Hill Sch. Dist. 161,*
    No. 23 CV 1284, 2024 WL 580012 (N.D. Ill. Feb. 13, 2024) ................................................19

*Taylor v. Salvation Army Nat'l Corp.,*
    110 F.4th 1017 (7th Cir. 2024) ................................................1, 26, 27, 45

*Taylor v. Salvation Army Nat'l Corp.,*
    No. 21-CV-6105, 2022 WL 22861527 (N.D. Ill. Sept. 19, 2022), *aff'd*, 110
    F.4th 1017 (7th Cir. 2024) ................................................26

*Tennessee Coal, Iron & Rail Co. v. Muscoda Local No. 123,*
    321 U.S. 590 (1944), *overruled on other grounds and superseded on other*
    *grounds by statute as stated in IBP, Inc. v. Alvarez*, 546 U.S. 21 (2005) ................................21

*Tony & Susan Alamo Found. v. Sec'y of Lab.,*
  471 U.S. 290 (1985) .................................................................... *passim*

*United States v. Rosenwasser,*
  323 U.S. 360 (1945) ....................................................................22

*Vanskike v. Peters,*
  974 F.2d 806 (7th Cir. 1992) ...............................19, 23, 24, 32

*Vaughn v. Phoenix House Found., Inc.,*
  No. 14-CV-3918, 2019 WL 568012 (S.D.N.Y. Feb. 12, 2019), *aff'd sub nom.*
  *Vaughn v. Phoenix House New York Inc.*, 957 F.3d 141 (2d Cir. 2020) ....................... *passim*

*Velarde v. GW GJ, Inc.,*
  914 F.3d 779 (2d Cir. 2019) ......................................................23

*Villarreal v. Woodham,*
  113 F.3d 202 (11th Cir. 1997) ..................................................23

*Walker v. Metro. Pier & Exposition Auth.,*
  No. 03 C 3725, 2004 WL 2534474 (N.D. Ill. Sept. 28, 2004)................................18

*Walling v. Portland Terminal Co.,*
  330 U.S. 148 (1947) .................................................................... *passim*

*Williams v. Strickland,*
  87 F.3d 1064 (9th Cir. 1996) .................................................. *passim*

**Statutes**

29 U.S.C. § 202(a) ..........................................................................24

29 U.S.C. § 203(d), (e)(1) ............................................................19

38 U.S.C. § 618 (1962) ..................................................................21

Fair Labor Standards Act § 203 .................................................21

Michigan Workforce Opportunity and Wage Act ...................54

Pub. L. No. 87-574, 76 Stat. 308 (1962).................................21

Wis. Stat. § 104 ..............................................................................55

Wis. Stat. § 104.01(2)(a)...............................................................55

Wis. Stat. § 104.02 ........................................................................54

Wis. Stat. § 109.01 .................................................................54, 55

Wis. Stat. § 109.03 ..................................................................................................54

**Other Authorities**

7 C.F.R. § 273.11(e) ..................................................................................................8

7 C.F.R. § 273.11(f) ...................................................................................................8

7 C.F.R. § 273.11(g) ..................................................................................................8

7 C.F.R. § 273.11(h) ..................................................................................................8

*Employ*, The Practical Standard Dictionary of the English Language (1924) ...............................19

Fed. R. Civ. P. 56 .....................................................................................................18

https://dokumen.pub/the-narcotic-farm-the-rise-and-fall-of-americas-first-prison-for-drug-addicts-9781949669251-2007048997-9781949669244-9781949669268.html ..........................................21

Mem. in Supp. of Pls' Mot. for Class Certification & Final Certification of the Collective, ECF No. 250 ..........................................................1, 32, 51, 53

*Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/employee (accessed Apr. 15, 2025) ....................................19

Webster's New International Dictionary of the English Language (2d ed. 1934) ........................19

## INTRODUCTION

Salvation is the key here, not work therapy or work. The Salvation Army, Central Territory ("TSA") is an Illinois nonprofit corporation, and part of the Universal Christian Church. TSA operates 14 Adult Rehabilitation Centers ("ARCs") as a holistic, spiritually based, residential program, the sole purpose of which is to provide disaffiliated individuals ("Beneficiaries") suffering from (among other social ills) homelessness, unemployment, and addiction, with access—at no monetary cost—to a therapeutic program designed to save their souls and free their bodies of addiction and abuse (the "Program"). TSA welcomes all Beneficiaries who are willing to participate in the ARC Program. And it does so during the lowest points in Beneficiaries' lives, when the source of their individual disaffiliation—whether drug or alcohol addiction, homelessness, unemployment, or the imminent threat of a criminal sentence—has affected them so acutely that they are ready to set aside their current dangerous lifestyles and habits and commit to a six-month journey of salvation, rehabilitation, and recovery. Simply put, the ARCs offer rehabilitation "for individuals seeking spiritual, emotional, and social assistance." *Taylor v. Salvation Army Nat'l Corp.*, 110 F.4th 1017, 1022 (7th Cir. 2024). What the ARCs do not offer Beneficiaries is employment.

Plaintiffs[1] are current and former Beneficiaries of the ARC Program who allege that they are entitled to be paid a minimum wage for the time spent in the program (and, as to Plaintiffs Clancy, Love, and Bryant only, overtime compensation) under the Fair Labor Standards Act and

---

[1] Current Plaintiffs include "Named Plaintiffs" and "Opt-in Plaintiffs" (those who have already filed consent forms to opt into the 216(b) collective under the Fair Labor Standards Act which has been only conditionally certified to date). Plaintiffs also bring putative class actions under Michigan, Illinois, and Wisconsin law, and filed their motion for class certification on March 28, 2025. *See* Mem. in Supp. of Pls' Mot. for Class Certification & Final Certification of the Collective, ECF No. 250 ("Mot. for Class Certification").

state law for their (sometimes repeated) stays in an ARC. Plaintiffs' claims require that they prove that they were employees; as such, their claims fail.

As the undisputed evidence shows:

1. Plaintiffs are not employees as contemplated under the FLSA;

2. Courts have routinely granted summary judgment to The Salvation Army on nearly identical claims;

3. An objective analysis of the undisputed facts confirm that the ARC is operated to provide rehabilitation and recovery for Beneficiaries, not employment;

4. Plaintiffs' arguments to the contrary fail as a matter of law because **the Beneficiaries are the primary beneficiaries of the ARC Program**;

5. Plaintiffs do not have an expectation of compensation because they understood when they enrolled in the ARC that they were enrolling of their own free will to address their individual life issues—homelessness, joblessness, and addiction, among others—not to seek compensation;

6. Consistent with its religious and charitable mission, Beneficiaries participate in the ARC Program for a limited period (generally no longer than six months) that has been found to be effective for rehabilitation purposes, not for indefinite periods;

7. The ARCs operate a network of thrift stores for the *sole purpose* of funding the rehabilitation program, not for any commercial purpose, and the ARCs operate at a deficit even after taking account of their sales in the thrift stores;

8. Plaintiffs' subjective experiences in the ARC Program do not create a dispute as to any material fact, and summary judgment is appropriate; and

9. Plaintiffs' state law and willfulness claims also fail for the same reasons their FLSA claims should be denied.

As such, consistent with prior cases from around the country, including *every* federal circuit court of appeals to consider the employment status of participants in a rehabilitation program, this Court should grant summary judgment to TSA on all of Plaintiffs' claims.

## FACTUAL BACKGROUND

*The Salvation Army's Mission*: The Salvation Army is an international religious denomination and charitable organization, a branch of the Universal Christian Church, founded by William Booth in England in 1865. (Defendant's Statement of Material Facts ("SOMF") ¶ 1.) From the beginning, a bedrock of The Salvation Army's mission has been the provision of social services to those who face poverty and addiction. Its premise was, and remains more than 150 years later, that by ensuring that people have access to basic necessities—shelter, food, and clothing—they can begin to address the social and spiritual issues that prevent them from leading productive lives. (SOMF ¶¶ 1, 3-5, 12.)

Over the decades, The Salvation Army has continued to adapt to ever-changing circumstances and societal needs. Today, separate regionally-based religious non-profit corporations operate its numerous religious and charitable programs in the United States, including TSA, which is the corporate instrumentality of The Salvation Army's Central Territory. (SOMF ¶ 2.) TSA currently operates 14 ARCs in Illinois, Indiana, Iowa, Michigan, Minnesota, Missouri, and Wisconsin.[2] (SOMF ¶ 6.) These ARCs are a living embodiment of TSA's Christian mission and deeply-held religious beliefs, and they serve thousands each year who come to the ARC seeking life-changing (and often life-saving) social and spiritual assistance. The ARCs provide a "safety net" program in the

---

[2] Three additional ARCs, including one in Nebraska, one in Illinois, and one in Indiana, were operational for part of the relevant time period, but have since closed. (SUMF ¶ 6.)

communities they serve, offering hope to those most in need. (*See* SOMF ¶¶ 3-5, 7, 11-12.)

***The Relationship Between TSA and its Beneficiaries*:** Each ARC provides a voluntary residential rehabilitation program on a charitable basis to disaffiliated individuals, most often those who suffer from substance abuse and are experiencing or have experienced homelessness. (SOMF ¶¶ 3-5, 22.)

The ARC Program is designed to be completed in approximately six months, which TSA has found provides Beneficiaries enough time to rid themselves of the harmful thoughts and habits that led to their disaffiliation, to pursue their individualized goals, and to develop the tools and skills that will lead them to be successful once they exit the Program. (SOMF ¶ 8.) As Beneficiaries reach certain milestones and complete required activities, they progress to the next "Level" of the Program. (SOMF ¶ 9.) A Beneficiary must complete Level 5 to graduate from the Program, with an optional Level 6 in which the Beneficiary is provided additional time to prepare themselves for leaving the Program. (SOMF ¶ 9.)[3]

Most Beneficiaries do not complete the six-month Program. (SOMF ¶ 17.) Many choose to leave because they discover that they are not ready to fully commit themselves to the very difficult and often physically and emotionally painful task of rehabilitation; others are discharged because they are unwilling to follow the rules of the Program. (SOMF ¶¶ 16-17, 37.) Regardless of the discharge reason, Beneficiaries often return to the ARC to try again. (SOMF ¶¶ 16-17, 48.) As is common with substance abuse, even Beneficiaries who have successfully graduated the Program may experience a relapse, and many of those Beneficiaries return to the Program, because

---

[3] Beneficiaries who have graduated and obtained employment (either through TSA or an external employer) also have the opportunity to enter into "Temporary Living Status" or "TLS," in which they are provided temporary housing for a limited time (up to 60 days) at no cost, allowing them additional time to search for and save up for housing upon their exit. Individuals in TLS are no longer Beneficiaries. (SUMF ¶ 130.)

their experience has shown them that the Program does work. (SOMF ¶ 17.)

*Pillars of TSA's Rehabilitation Program*: TSA's rehabilitation program has three pillars: (a) salvation, (b) counseling and classes, and (c) work therapy. (SOMF ¶ 14.) Each of these pillars plays a distinct role in a Beneficiary's rehabilitative journey and therefore each is an essential and mandatory component of the holistic program.

> 1.      Salvation can be gained by developing and deepening one's spirituality.

The Salvation Army's mission is to serve the poor, disaffiliated and downtrodden and to "help men and women as an expression of Divine love." (SOMF ¶ 15.) The ARC Program is grounded in The Salvation Army's firmly-held religious belief that Beneficiaries who develop a "helpful and effective personal relationship with God" will be able to overcome any addiction and social ill. (SOMF ¶ 15.) To remain in the Program, Beneficiaries must attend weekly chapel services, daily devotions, regular Bible study, and gatherings at the ARCs' places of worship, along with witnessing and participating in TSA's demonstration of Christian living which is embodied in the actions of its staff and in the counseling and classes offered at the ARCs. (SOMF ¶¶ 52-54.) Although the ARC is a Christian program, TSA does not discriminate based on religion, and Beneficiaries of all religious backgrounds are welcome if they agree to participate in the entire ARC program. (SOMF ¶ 50.)

> 2.      Counseling and classes help Beneficiaries to confront the issues that brought them to the ARC and help them to achieve their goals.

The Program provides ongoing spiritual counseling to all Beneficiaries with a TSA counselor. (SOMF ¶¶ 51, 55, 62.) Beneficiaries must complete journals that are designed to help them reflect on their struggles, values, and goals. (SOMF ¶¶ 61-62.) For example, each Beneficiary begins with "What Got Me Here," which is used to help the Beneficiary "focus on [their] past so that [they] have a personal foundation to begin making a positive and lasting lifestyle change.

(Ex. 232 to SOMF ¶ 61.) Every Beneficiary also sets goals that they hope to accomplish while in the ARC and works with their spiritual counselor to track their progress towards those goals. (SOMF ¶ 62.)

Beneficiaries participate in group counseling, 12-step meetings, such as Alcoholics Anonymous and Narcotics Anonymous, and self-improvement classes, including elective classes that address their specific goals and needs. (SOMF ¶¶ 55, 56, 57.) The classes that are offered change as the Beneficiary progresses in the Program, and include classes like Addiction Education, Fatherhood, Anger Management, Job Readiness, Life Skills, and Christian Living. (SOMF ¶ 57.) Together, spiritual counseling, journaling, 12-step meetings, and classes create an individualized experience that allows Beneficiaries to reflect on and understand struggles that have led them to the ARC, and gives them the time they need to develop tools and skills to build stronger relationships and turn away from the vices and temptations they will face when they leave the ARC. (SOMF ¶¶ 8, 55, 60.)

> 3.   Work therapy teaches Beneficiaries life skills and healthy habits, and builds character traits necessary to lead productive lives.

Work therapy supports the Beneficiaries' rehabilitation and spiritual regeneration, and is designed to (1) provide Beneficiaries the opportunity to learn much-needed life skills, discipline, work ethic, and habits that will allow them to reclaim, and in many instances, form a sense of self-esteem and self-worth; (2) imbue them with a sense of personal accountability and pride, and help them re-enter the workforce as productive members of their respective communities; (3) reduce idle time as much as possible as their bodies and minds acclimate to daily life protected from many of the issues that plagued them outside the Program; and (4) simulate real-world work and interpersonal interactions that allow Beneficiaries to develop and use new social skills and healthy coping mechanisms in an often hectic and demanding work environment. (SOMF ¶ 75.)

Work therapy is not a new concept or unique to the ARC Program; rather, the therapeutic benefits of work activity have been recognized and utilized as psychiatric treatment by the medical community for well over 200 years. (SOMF ¶ 68.) The United States government has also recognized the effectiveness of work therapy since at least 1929, when it became an essential part of treatment for veterans of World War I diagnosed with what was then called "war neurosis." (SOMF ¶ 72.) In fact, in 1962, Congress authorized the Department of Veterans' Affairs' Incentive Therapy program, which provided veterans suffering from psychiatric or substance abuse disorders a variety of work therapy assignments designed to help patients "normalize interactions and enhance self-esteem." (SOMF ¶ 73.) Notably, the Incentive Therapy program included a small monetary incentive that was *explicitly <u>not</u>* intended as compensation or wages. (SOMF ¶ 74.)

Work therapy assignments around the ARC include sorting and hanging donated goods in the warehouse, picking up donations in the community, cleaning the dormitories, kitchen duties, and clerical work. (SOMF ¶ 79.) Work therapy requires that Beneficiaries report to their assignments on time, complete the assignments under the supervision of TSA employees,[4] and perform the assignments with other Beneficiaries—who support each other in their rehabilitation journey—about eight hours per day, five days a week. (SOMF ¶¶ 76, 81.)

Beneficiaries are closely supervised by TSA employees, to both track their rehabilitative progress and direct and correct their performance of day-to-day tasks, which often means that the TSA employees work side-by-side with Beneficiaries to help them learn the skills they need to perform assigned tasks. (SOMF ¶ 81.) These employees also model appropriate workplace behavior and help Beneficiaries develop soft skills needed for successful workplace experiences,

---

[4] Plaintiffs do not contend that TSA fails to comply with the FLSA in compensating its employees. *See generally*, Compl. (ECF No. 1).

such as healthy workplace interactions, communication, and accountability. (SOMF ¶ 81.) TSA Supervisors offer feedback on each Beneficiary's participation in work therapy, and ARC staff hold weekly conferences to discuss each Beneficiary's progress in the Program, which may include disciplinary issues, including failure to abide by the rules or complete assignments. (SOMF ¶¶ 63, 81.) But poor performance during work therapy is *not* grounds for discharge from the Program, and TSA does not withhold food and shelter based on the quantity or quality of the Beneficiary's work therapy performance. (SOMF ¶¶ 47, 82.)

As Beneficiaries progress through the Program, they may be entrusted with more complex and individual tasks to provide them with a greater sense of responsibility and feeling of self-worth. (SOMF ¶ 80.) Their work therapy schedule may also change; for example, Beneficiaries in Level 6 are provided time away from Program requirements, including work therapy, each week to allow them time to search for jobs and sober housing. (SOMF ¶ 9.)

***The ARC Program is Offered on a Charitable Basis***:  The ARC Program, including shelter, meals, counseling, and other services, is provided to most Beneficiaries at no cost, and no Beneficiary has ever been turned away from the ARC for inability to pay. (SOMF ¶ 5.) But Beneficiaries, including four of the five Named Plaintiffs[5] and many Opt-in Plaintiffs, have been asked to turn over their government-provided benefits to the ARC, including those provided by the Supplemental Nutrition Assistance Program ("SNAP benefits," or "food stamps"),[6] so that the

---

[5] According to TSA records, Plaintiff Peters applied for SNAP benefits but was ineligible to receive them. (SUMF ¶ 20.)

[6] The Supplemental Nutrition Assistance Program ("SNAP") is a federal benefits program through which eligible low-income individuals receive a debit card through which they can purchase food at retail stores. The statute and regulations authorize certain programs to utilize these benefits to provide food to eligible individuals. *See, e.g.*, 7 C.F.R. § 273.11(e) (drug and alcohol rehabilitation programs); 7 C.F.R. § 273.11(f) (group living arrangements); 7 C.F.R. § 273.11(g) (shelters for battered women and children); and 7 C.F.R. § 273.11(h) (authorized homeless meal providers).

ARC could offset the costs of food. (SOMF ¶ 20.) And during the relevant class period, Beneficiaries with an income may have been asked to contribute to room and board. This practice was discontinued in 2023, as the minimal amounts paid by Beneficiaries did little to defray TSA's costs and TSA chose to eliminate any burden this contribution may have on Beneficiaries and their families. (SOMF ¶ 21.)

*Intake*: The Beneficiaries' first contact with the ARC is through the intake process. (SOMF ¶ 26.) TSA typically requires that Beneficiaries are sober at intake, which helps to ensure that (1) Beneficiaries are in the right frame of mind and able to understand their decision to enter the Program; and (2) their entering the Program does not disrupt the rehabilitation of other Beneficiaries. (SOMF ¶ 27.)

At intake, the rehabilitative purpose, goals, expectations, rules and requirements of the Program are presented in writing and orally by an Intake Clerk or Coordinator. (SOMF ¶¶ 26, 28-31.) Beneficiaries are given the opportunity to ask questions and review all documents and forms so that they can make an informed decision about enrolling in the Program. (SOMF ¶ 32.) Beneficiaries are also given the policies and documents explaining the charitable nature of the Program and its faith-based mission. (SOMF ¶¶ 28-32, 35.)

Each Beneficiary is required to review and sign a "Beneficiary Admittance Statement," which expressly acknowledges that:

> **I recognize my need for assistance** and hereby apply for admission to the Adult Rehabilitation Center. I understand that The Salvation Army is a religious and charitable organization and that this Adult Rehabilitation Center is dedicated solely to the social and physical rehabilitation and the spiritual regeneration of those persons who are in need of such assistance. **I further understand that under no circumstances can this Center be under any obligation to me; and that I am a beneficiary and not an employee of this Center. I understand that my admission and continued residence is dependent upon my needing such assistance and my willingness**

**to help myself and others so situated, including the voluntary performance of such duties as may be assigned to me.**

(SOMF ¶ 28) (emphasis added).

Each Beneficiary also signs a Consent for Testing of Alcohol and/or Drug Use form acknowledging that they will be tested during the Program and that if they test positive, or fail to submit for a test, they will be discharged. (SOMF ¶¶ 31, 36.) They are also provided with documents and forms stating that if they fail to abide by any of the rules and requirements of the Program—including grooming policies and program participation—they may be discharged. (SOMF ¶¶ 35, 37.) Each Beneficiary is also asked to confirm their understanding of the requirements of the Program, that they must actively participate in work therapy assignments that involve physical labor, and that they must participate in Christian worship and other spiritual activities as part of their rehabilitation program. (SOMF ¶¶ 29-30.) After enrollment, details about the Program, including the rules and requirements, are reinforced during the earliest stages of the Program in an orientation class—to ensure that Beneficiaries are fully aware of the nature and requirements of the Program and also provide an additional opportunity to ask questions and understand the Program. (SOMF ¶ 33.)

The ARC is not a perfect fit for everyone. If an individual is deemed ineligible or otherwise chooses not to enroll in the ARC, that Beneficiary is provided with a "warm hand-off," usually a personalized referral to another rehabilitation or detoxification program that could better suit their needs. (SOMF ¶ 34.)

***The Rehabilitative Schedule:*** The Program helps Beneficiaries who want to build better habits and focus on their rehabilitation by removing the opportunity to give in to temptations and engage in vices so that they can replace these urges with the distraction of a safe and healthy routine. (SOMF ¶ 12.) Beneficiaries are kept active and under strict oversight during their

10

rehabilitation because idle time has proven to be an opportunity for Beneficiaries to succumb to addictions, personal demons, and other challenges that could hinder their progress in the Program. (SOMF ¶ 13.)

Beneficiaries must participate in morning devotions, which include the reading of scripture and prayer. (SOMF ¶ 53.) After breakfast, they participate in work therapy for up to eight hours a day. (SOMF ¶ 76.) After work therapy, Beneficiaries continue their rehabilitative activities with spiritual counseling, classes, or 12-step meetings. (SOMF ¶¶ 55-57.) Twice a week, including Sundays, Beneficiaries must attend worship services. (SOMF ¶ 52.) Though idle time is limited, ARCs have recreational rooms for use in Beneficiaries' spare time, which may include a weight room, computer room, and TV and game room. (SOMF ¶ 60.) Each ARC also organizes additional recreational programming for its current Beneficiaries and alumni, including community engagement events, retreats, sporting events, gospel choir, and events for the holidays. (SOMF ¶ 60.)

During the first 30 days of the ARC Program, Beneficiaries generally are restricted to remain on the ARC premises, and are not permitted to have any outside contact except by mail, as a means to separate them from any potential temptations that could hinder their recovery. (SOMF ¶ 58.) Beneficiaries who progress to more advanced Levels in the Program are encouraged to attend community meetings or religious services outside the ARC to help them begin to establish stable and healthy relationships that can serve them well and prevent relapse after graduation from the Program. (SOMF ¶ 59.)

***ARC Rules and Restrictions:*** Each Beneficiary must abide by a strict set of rules, ranging from the fundamentals for safety and rehabilitation—staying sober, participating in all mandatory elements of the Program, not engaging in fighting or violent behavior—to the more minute

standards of living—keeping their dormitory clean, following the dress code and grooming practices, and refraining from profanity. (SOMF ¶¶ 35-36.) The rules further the ARC's mission to provide a safe, supportive, and structured program.

TSA also has a progressive disciplinary policy for any Program infraction, which includes verbal and written warnings, practical consequences, and eventually (or when a first infraction is serious), discharge from the Program. (SOMF ¶ 38.) Discipline and personal accountability are important, both for the rehabilitation of the Beneficiary committing the infraction, and for the safety and rehabilitation of other Beneficiaries. TSA imposes discipline for violations of the rules to ensure that the ARC remains a safe haven for those who seek to replace the chaos and temptation of their prior lives with structure and accountability. (SOMF ¶ 40.)

Despite the need to enforce the disciplinary policy, however, TSA considers itself to be a "program of a thousand chances," granting grace and forgiveness to those who seek it and those ready to turn their life around. (SOMF ¶¶ 16-17.) Beneficiaries who are discharged for significant infractions (stealing, using drugs and alcohol) typically are permitted to return to the Program as soon as 30 days after discharge, *if* they are ready to re-commit to their rehabilitation journey. (SOMF ¶¶ 16-17.)

*Gratuities*: Beneficiaries receive a small gratuity (between $7 and $35 per week[7]). (SOMF ¶ 65.) The gratuity is provided solely based on a Beneficiary's progress through the various stages of the Program and is not tied to the quality or quantity of work therapy performed. (SOMF ¶ 65.) The amount is intended to strike a balance—not too little, not too much—to recognize progress without giving significant amounts of cash that could undermine their rehabilitation if used, for

---

[7] Earlier in the relevant time period, the maximum amount of weekly gratuity was $25, but it was increased to $35 in 2023. The minimum amount of weekly gratuity also increased from $7 to $17. (SUMF ¶ 65.)

example, for drugs, alcohol, and gambling. (SOMF ¶ 65.) At times, TSA has decreased a gratuity because of non-compliance with Program rules, such as failure to satisfactorily participate in required elements of the Program. (SOMF ¶ 67.)

*Named Plaintiffs***:**  The five named Plaintiffs each attended a different ARC in the Central Territory. None testified that they enrolled in the ARC because they thought it provided them with employment; rather each enrolled seeking rehabilitative services, and testified to the specifics of the services they received.

**Michael Clancy** enrolled in the Chicago, Illinois ARC first in August 2017 to secure shelter and help for his alcohol addiction, after experiencing homelessness and an arrest for ███████████████████████. (SOMF ¶¶ 83-84.) While in the ARC, Mr. Clancy participated in religious services, work therapy, and attended classes. These classes included a computer class where he learned for the first time—at age 61—how to use a computer and send emails, which helped him to search for jobs prior to his completion of the Program. (SOMF ¶ 85.) Mr. Clancy re-enrolled in the ARC Program two more times in July 2018 and 2019, at ages 62 and 63, respectively. (SOMF ¶ 83.) Mr. Clancy testified that prior to graduating the ARC, he had not been employed in a steady job for 40 hours a week for almost 20 years. (SOMF ¶ 87.) At the time of his deposition, he had remained sober for at least four years—since his 2019 enrollment. (SOMF ¶ 86.)

**Stuart Love** enrolled in the Kansas City, Missouri ARC first in November 2019, at age 52, and again in January 2021, at 53, because he wanted to "get help immediately." (SOMF ¶ 88.) Prior to joining the ARC, Mr. Love experienced homelessness, struggled with alcohol and ███████ addiction, and reported that he had suffered from ██████████████ for nearly 30 years. (SOMF ¶ 89.) Mr. Love's drug and alcohol addiction "made it impossible for [him] to continue working." (SOMF ¶ 90.) He also faced arrests because of his addiction, going to prison

13

twice for felony charges of driving under the influence. (SOMF ¶ 89.) He testified that multiple aspects of the ARC Program had positive effects on his life and his sobriety, including the access to mental health services, three meals a day, and spiritual guidance. (SOMF ¶ 91.) Following successful completion of the Program, Mr. Love was employed at a company called High Tech Foam and earned more than $30,000 in 2022. He testified that this was the first time he made that much money in a single year. (SOMF ¶ 92.)

**James Peters** enrolled in the Detroit, Michigan ARC in January 2019, at age 51, and successfully completed the Program. Prior to enrolling in the ARC, Mr. Peters had struggled with alcohol addiction and illicit drug use for more than 42 years, and in the months immediately prior to enrolling, he was ▮▮▮▮▮▮▮▮▮▮ being evicted because of his addiction to drugs. (SOMF ¶ 93.) Mr. Peters' substance abuse also affected his ability to remain employed; he was terminated from one job because he was using his phone while at work to search for drugs. (SOMF ¶ 93.) During his time in the ARC, Mr. Peters took a class on Christian Living, and found the class, along with Bible study and "step study," as well as spiritual counseling, helpful to his recovery. (SOMF ¶ 95.) At the time of his deposition, Mr. Peters had remained sober since just prior to his admission to the ARC. He also believes that sobriety helped to heal his relationship with his daughter. (SOMF ¶ 97.) Mr. Peters returned to the Detroit ARC to give a talk to other TSA beneficiaries about the pain from his 42 years of addiction and how he found a solution to his addiction after he "surrendered" and learned from the spiritual journey he began while enrolled as a beneficiary. (SOMF ¶ 96.)

**Thomas Bryant** enrolled in an ARC on at least five separate occasions, four of which were in the Central Territory. (SOMF ¶ 98.) He first enrolled in the Flint ARC in September 2014, at

14

age 34. He enrolled in 2016, 2019, and 2020, at ages 35, 38, and 40,[8] in the Grand Rapids ARC, and finally, in 2021, again, at age 40, in the Toledo, Ohio ARC in The Salvation Army's Eastern Territory and therefore not operated by Defendant TSA. (SOMF ¶ 98.) Mr. Bryant was motivated to enroll in the ARC because he was homeless and wanted to seek help for his ▆▆▆ addiction, with which he had struggled since 2009. (SOMF ¶ 99.) Mr. Bryant also attended two non-TSA rehabilitation programs between 2019 and 2022. (SOMF ¶ 99.) Mr. Bryant went on to be employed as a certified substance use disorder clinician, a career path that his time in the ARC helped him to determine. (SOMF ¶ 100.)

**Samuel Patton** first enrolled in the ARC in Milwaukee, Wisconsin in 2000[9] at the age of 38, based on a referral from his probation officer. He later chose to re-enroll approximately four times between the years of 2000 and 2017. (SOMF ¶ 101.) He enrolled again in the summer of 2020, at age 58, and once more in July 2022, at age 60, because he was homeless and seeking help with substance abuse, including the use of ▆▆▆▆▆▆. (SOMF ¶ 101.) The faith-based nature of the Program was one of the reasons Mr. Patton returned to the Program, and he testified that with each ARC stay, he felt he got "another level of [God's] plan and purpose for what [H]e has for us in life," and that this helped him to get "wiser . . . to know what's right, have a smart day to make the right choices." (SOMF ¶ 102.) Mr. Patton felt that the ARC was "like a sanctuary," a place where he could go "to get some help," to keep away from drugs, and to avoid doing harm to himself. (SOMF ¶ 102.) Mr. Patton enjoyed singing in the choir and participating in bible study. During his time at the ARC, he won the "Beneficiary of the Week" award and the "Extra Mile" award. These awards gave him a sense of pride, as he felt that he was recognized for doing "the

---

[8] Only the 2019 and 2020 Grand Rapids ARC stays are at issue in this lawsuit.

[9] This ARC stay is not within the class period and is therefore not at issue in this lawsuit.

most good." (SOMF ¶ 103.) At the time of his deposition, Mr. Patton had remained sober since his 2022 ARC enrollment. He noted that he was "very, very grateful" for TSA's role in helping him "bounc[e] back" and "get[] [his] life on track." (SOMF ¶ 104.)

*ARC Outcomes*: Like all rehabilitation programs, the ARC Program is only effective when a Beneficiary is ready and willing to truly change their life and leave their old habits and routines behind. Many Beneficiaries leave the Program without completing it, and many others relapse at some point after graduation. Many who relapse return to the Program because they know that it *can* work if they are able to commit. (SOMF ¶¶ 17, 48.) In fact, many of the Plaintiffs in this case enrolled in an ARC multiple times, and many cite the date of their most recent ARC enrollment as their "sober date." (SOMF ¶¶ 48, 110.) And many of the Beneficiaries who successfully graduate from the Program and now lead happy, successful, and sober lives, enrolled in the Program more than once.

Graduating from the ARC Program is truly a celebration. For many, this is the first time that they have been consistently sober in recent memory. When Beneficiaries graduate from the Program, they are celebrated with a graduation ceremony, which is a joyous affair where Beneficiaries invite their friends and family to share in their accomplishments. (SOMF ¶ 18.) TSA alumni, which include, but are not limited to, current employees, church members, and TSA Officers (clergy), continue to credit TSA with their salvation and sobriety. TSA has collected declarations from five former Beneficiaries whose lives have been turned around by the ARC Program. (*See* SOMF ¶¶ 105-109, Ex. 255 (Richard Loftus, who enrolled in the Minneapolis ARC in 2008 after losing his company, home, and connections to family and friends, and maintains that the ARC saved his life); Ex. 67 (Ryan Berg, who enrolled in the Minneapolis ARC in 2008 and 2020 because of his struggles with alcoholism, and credits the ARC for helping to repair his relationships with his friends and family); Ex. 256 (DeMarcus Teamer, who enrolled in an ARC on four occasions to seek help with

his addiction to alcohol, and now returns to the ARC on a weekly basis and employs other ARC graduates); Ex. 257 (Stephen Day, who participated in the ARC in Indianapolis in 2013 and has remained sober since the day he entered the program); Ex. 258 (Ken Osborn, who enrolled as a beneficiary in the ARC in Fort Wayne, Indiana, in 2019 and 2020, and who returns to the ARC twice a week to lead meetings and help other Beneficiaries)). These five individuals are provided as an illustration of the life-saving effects that the ARC Program has provided to thousands of Beneficiaries.

*ARC Funding***:**  The ARC Program is provided at little or no cost to Beneficiaries and is funded primarily through donations and fundraisers. (SOMF ¶ 131.) ARCs receive both monetary donations and donated goods, which include everything from clothing to miscellaneous household goods; these donations require TSA to have a system to convert those donations into the operating funds that support the Program and the Beneficiaries. (SOMF ¶¶ 131-32.) So, each ARC operates thrift stores in their geographical region; it processes donated goods in a warehouse adjacent to the living quarters; and it sells the goods in its thrift stores to generate cash that can be used to pay operating expenses of the ARCs. (SOMF ¶ 132.)

All revenue generated by the sale of donated goods in the thrift stores is used to fund the ARCs. (SOMF ¶¶ 132-134.) In fact, these thrift stores operate for the *sole purpose* of funding the ARCs. But despite their best efforts, ARCs continuously operate at a deficit, meaning that the expenses of the vast majority of the ARCs far exceed the revenues derived from the sale of donated goods and other contributions from the public. (SOMF ¶ 136.) To cover deficits and remain operational, and thus continue their religious and charitable mission in the Central Territory, ARCs receive from TSA charitable funds raised in other ways. (SOMF ¶ 136.)

17

## LEGAL STANDARD

To prove liability under the FLSA and its state counterparts, Plaintiffs bear the burden to establish that they are employees. *Berger v. Nat'l Collegiate Athletic Ass'n*, 843 F.3d 285, 290 (7th Cir. 2016). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes that could affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Walker v. Metro. Pier & Exposition Auth.*, No. 03 C 3725, 2004 WL 2534474, at *1 (N.D. Ill. Sept. 28, 2004) (internal quotation marks and citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). Rule 56 "mandates" summary judgment against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## ARGUMENT

## I. Beneficiaries Are Not Employees Under the FLSA.

The question at issue in this case is not whether Beneficiaries engage in activities involving "work," but rather whether such activities are performed in the context of an *employment relationship*.[10] The answer here is no.

The FLSA defines an "employee" as "any individual employed by an employer" and an "employer" as "any person acting directly or indirectly in the interest of an employer in relation to

---

[10] As this Court has held, "[w]hether certain activities constitute work under the FLSA is a matter of law, not of fact." *Callahan v. City of Chicago*, 78 F.Supp.3d 791, 829 (N.D. Ill. 2015), *aff'd*, 813 F.3d 658 (7th Cir. 2016).

an employee[.]" 29 U.S.C. § 203(d), (e)(1). While courts have acknowledged the "circular" nature of these definitions (*Vanskike v. Peters*, 974 F.2d 806, 807 (7th Cir. 1992)), both the plain meaning and the original meaning confirm that the term "employee" broadly applies to situations in which individuals engage in an *arm's length exchange of labor for compensation*, and that the term "employee" is not, and at the time of enactment would *not* have been, commonly understood to cover individuals participating in rehabilitation programs for their own benefit. For example, contemporaneous dictionaries defined the term "employee" as "one who *works for wages or salary in the service of an employer*" (Webster's New International Dictionary of the English Language (2d ed. 1934) (emphasis added)) and stated that "a person may be employed in his own work or in that of another; in the latter case the service is *always understood to be for pay*" (*Employ*, The Practical Standard Dictionary of the English Language (1924) (emphasis added))[11]. *See Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 800 (2024) (applying the "well-settled meaning" of the statute of limitations provision of the 1948 Administrative Procedure Act and looking to "[c]ontemporaneous legal dictionaries"). Modern dictionaries similarly define "employee" as "one employed by another usually for wages or salary and in a position below the executive level." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/employee (accessed Apr. 15, 2025). *See Strzykalski v. Bd. of Educ. of Summit Hill Sch. Dist. 161*, No. 23 CV 1284, 2024 WL 580012, at *5 (N.D. Ill. Feb. 13, 2024) ("Unless words are otherwise defined in a statute, 'they will be interpreted as taking their ordinary, contemporary, common meaning.'") (quoting *United States v. Melvin*, 948 F.3d 848, 851-52 (7th Cir. 2020) ("We find words' ordinary, contemporary, common meaning by looking at what they meant when the statute was enacted, often by referencing contemporary dictionaries.")). Such

---

[11] *See* Declaration of Toni Michelle Jackson in Support of Defendant The Salvation Army's Motion for Summary Judgment ("Jackson Decl."), App. A (attaching dictionary excerpts).

definitions are also consistent with a common-sense understanding of the term "employee."

Moreover, nothing in the text or structure of the FLSA would support a conclusion that the FLSA would extend to participants in a holistic rehabilitation program who perform therapeutic activities involving work. *See Jackson v. Blitt & Gaines, P.C.*, 833 F.3d 860, 863 (7th Cir. 2016) (stating that courts "must look to the particular statutory language at issue, as well as the language and design of the statute as a whole") (citation omitted). There is no indication in the FLSA that Congress intended to depart from these commonly understood definitions and sweep in individuals participating in a rehabilitation program. *See Corner Post*, 603 U.S. at 811-12, 819 (noting that "Congress knew how to depart from the traditional rule," as understood by the original public meaning of the statutory language, and refusing to infer that it intended to do so "in the absence of any such indication in the text").

Work therapy was utilized as a form of psychiatric treatment performed at hospitals in the years leading up to the enactment of the FLSA, a fact that further reinforces the notion that work therapy is not employment under the FLSA. (SOMF ¶ 72.) Indeed, following World War I, work therapy had become an essential part of treatment for veterans suffering from what was then called "war neurosis." (SOMF ¶ 72.) A 1929 report by the Surgeon General's Office of Services of The US Army Medical Department recognized the "individual therapeutic effect" of "occupational therapy" (as work therapy was known at the time), which was an "established part of the routine treatment" at a hospital treating nearly 3,000 cases of war neurosis. (SOMF ¶ 72.) Congress would also have been aware of the role of work therapy as a tool for drug and alcohol rehabilitation at the time it passed the FLSA. *See* Nancy D. Campbell, *The Narcotic Farm: The Rise and Fall of*

20

*America's First Prison for Drug Addicts* (2021 ed.)[12] (describing the work therapy programs at the federally-run "Narcotic Farms" in the 1930s).[13] Congress enacted the FLSA with both this historical framework, and the common understanding of the terms "employee" and "employ" in mind. The contrary suggestion that Congress passed the FLSA with the intention that it could be interpreted so broadly as to include, for example, war veterans permitted to work in a hospital workshop as part of their treatment, or individuals performing work therapy at a residential rehabilitation program, is entirely atextual. Notably, although the text of Section 203 of the FLSA has been amended several times, Congress has never amended it to include reference to work therapy. *See also Bennett v. Frank*, 395 F.3d 409, 410 (7th Cir. 2005) ("The reason the FLSA contains no express exception for prisoners is probably that the idea was too outlandish to occur to anyone when the legislation was under consideration by Congress.").[14]

Supreme Court case law in the years immediately following the enactment of the FLSA reaffirms the original public meaning, and the plain meaning, of the text of the FLSA as laid out above. For example, in *Tennessee Coal, Iron & Rail Co. v. Muscoda Local No. 123*, 321 U.S. 590, 597-98 (1944), *overruled on other grounds and superseded on other grounds by statute as stated in IBP, Inc. v. Alvarez*, 546 U.S. 21, 25-28 (2005), the Supreme Court looked to the "remedial"

---

[12]     https://dokumen.pub/the-narcotic-farm-the-rise-and-fall-of-americas-first-prison-for-drug-addicts-9781949669251-2007048997-9781949669244-9781949669268.html.

[13] That Congress would not have viewed work therapy as employment is further supported by the government's continued use of work therapy programs for veteran populations, including by passing legislation authorizing "Incentive Therapy" and "Compensated Work Therapy" (38 U.S.C. § 618 (1962)), which allowed the Administrator of the VA to "utilize the services of patients and members in Veterans' Administration hospitals and domiciliaries for therapeutic and rehabilitative purposes, *at nominal remuneration*, and such patients and members shall not under these circumstances be held or considered as employees of the United States for any purpose." Pub. L. No. 87-574, 76 Stat. 308 (1962) (emphasis added).

[14] Notably, the text of the FLSA does not contain an explicit exception for *any* of the categories of work activity cited below at 23-24, further proof that the lack of an explicit exception for rehabilitation programs does not indicate that such programs fall under the broad definition of the FLSA.

purpose of the FLSA in determining whether travel time should be compensated, confined by the assumption that Congress "was referring to work or employment . . . *as those words are commonly used—as meaning physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business*." (Emphasis added.) *See also* Armour & Co. v. Wantock, 323 U.S. 126, 128, 132-33 (1944) (holding that the FLSA applied to time in which employees were required to wait on standby "*for the benefit of the[ir] employer*") (emphasis added); United States v. Rosenwasser, 323 U.S. 360, 363 (1945) (holding that the FLSA applies to piece-rate workers because the definition of employee "obviously and necessarily includes one *compensated* by a unit of time, by the piece or by any other measurement") (emphasis added); *Callahan*, 78 F.Supp.3d at 802.

This principle was solidified in the Supreme Court's 1947 decision in *Walling v. Portland Terminal Co*. There, the Court rejected the plaintiff's argument that he was an "employee" by virtue of having participated in a pre-employment training program sponsored by a railroad, even though such trainees "do work in the kind of activities covered by the Act." 330 U.S. 148, 150 (1947). Instead, the Court stated plainly that such a broad reading would "sweep under the Act each person who, without promise or expectation of compensation, but solely for [their] personal purpose or pleasure, worked in activities carried on by other persons either for their pleasure or profit." *Id.* at 152. Such an outcome would be completely at odds with the Act's purpose "to insure that every person whose employment contemplated compensation should not be compelled to sell his services for less than the prescribed minimum wage." *Id.*

*Walling* laid the groundwork for many subsequent cases finding no employment relationship in numerous contexts in which a person or entity directed or controlled activities of another that might be characterized as "work," but where the relationship did not manifest the

22

bargained-for exchange of labor that defines employment under the FLSA. The Seventh Circuit requires courts to "examine the 'economic reality' of the working relationship" and in doing so, has found no employment relationship to exist in varying scenarios involving work. *See, e.g.*, *Vanskike*, 974 F.2d at 808-09 (labor performed in prison does not create an employment relationship because it "does not stem from any remunerative relationship or bargained-for exchange of labor for consideration") (citation omitted); *Hollins v. Regency Corp.*, 867 F.3d 830 (7th Cir. 2017) (cosmetology student trainee not an employee under the FLSA);[15] *Berger*, 843 F.3d at 293 (college athletes are not employees under the FLSA). Other examples where the individual engaged in the work for his or her own benefit—in addition to various cases around the country granting summary judgment to The Salvation Army's ARC Program itself (*see* Section II below)— include work performed as a requirement of living in a homeless shelter,[16] work performed as an alternative to incarceration,[17] and work performed as an alternative to military service.[18] Courts have reached similar outcomes in cases involving work performed in pretrial and civil detention situations,[19] volunteer work,[20] and work performed by romantic partners sharing in a business.[21] These situations, much like the one here, simply do not resemble a conventional employment

---

[15] *See also Schumann v. Collier Anesthesia, P.A.*, 803 F.3d 1199 (11th Cir. 2015); *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528 (2d Cir. 2016); *Velarde v. GW GJ, Inc.*, 914 F.3d 779 (2d Cir. 2019); *Solis v. Laurelbrook Sanitarium & Sch., Inc.*, 642 F.3d 518 (6th Cir. 2011).

[16] *Armento v. Asheville Buncombe Cmty. Christian Ministry, Inc.*, 856 F. App'x 445 (4th Cir. 2021).

[17] *Doyle v. City of N.Y.*, 91 F. Supp. 3d 480 (S.D.N.Y. 2015); *Vaughn v. Phoenix House Found., Inc.*, No. 14-CV-3918, 2019 WL 568012 (S.D.N.Y. Feb. 12, 2019) ("*Vaughn I*"), *aff'd sub nom. Vaughn v. Phoenix House New York Inc.*, 957 F.3d 141 (2d Cir. 2020) ("*Vaughn II*").

[18] *Isaacson v. Penn Cmty. Servs., Inc.*, 450 F.2d 1306 (4th Cir. 1971).

[19] *Villarreal v. Woodham*, 113 F.3d 202 (11th Cir. 1997); *Guevara v. I.N.S.*, 902 F.2d 394 (5th Cir. 1990); *Ndambi v. CoreCivic, Inc.*, 990 F.3d 369 (4th Cir. 2021).

[20] *See, e.g.*, *Freeman v. Key Largo Volunteer Fire & Rescue Dep't, Inc.*, 494 F. App'x 940 (11th Cir. 2012) (volunteer firefighters); *Acosta v. Cathedral Buffet, Inc.*, 887 F.3d 761 (6th Cir. 2018) (church-owned restaurant operated with unpaid church members).

[21] *Steelman v. Hirsch*, 473 F.3d 124 (4th Cir. 2007).

relationship, in which there is a bargained-for exchange of labor for compensation. *Vanskike*, 974 F.2d at 808.

As demonstrated in detail in the sections that follow, Congress's dual purposes in enacting the FLSA, namely, (1) ensuring a "minimum standard of living"; and (2) preventing unfair competition in commerce from the use of underpaid labor, further confirm that the FLSA does not apply to Beneficiaries who voluntarily enroll in a charitable, residential, holistic rehabilitation program and engage in therapeutic work activities as one component of that program. *See* 29 U.S.C. § 202(a); *Vanskike*, 974 F.2d at 810. In 1945, the Supreme Court explained that "[t]he legislative debates indicate that the prime purpose of the [FLSA] legislation was to aid the unprotected, unorganized and lowest paid of the nation's working population; that is, those employees who lacked sufficient bargaining power to secure for themselves a minimum subsistence wage." *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707 n.18 (1945).[22]

The first purpose of the FLSA is not implicated here, where Beneficiaries enroll in an ARC not to earn wages or ensure a minimum standard of living, but to engage in a rehabilitation program. Plaintiffs did not expect to be paid an hourly wage for their time in the ARC. (SOMF ¶ 45.) Nor should they, as most rehabilitation programs would require the *participant* to pay for enrollment, not the other way around. In an analogous context, the Seventh Circuit did not consider the FLSA's purpose of ensuring a minimum standard of living when it held that interns performing work for their for-profit cosmetology school were not employees. *Hollins*, 867 F.3d 830. This is because this purpose has no application where the activity being pursued (be it rehabilitation or an educational training program) is not itself intended to provide a "standard of living."

---

[22] This reference to "employees who lacked sufficient bargaining power" further reinforces the conclusion at 18-20 above that the well-settled meaning of the term "employee" under the FLSA applies to relationships involving the "bargained-for exchange of labor for compensation."

The secondary purpose of the FLSA—preventing unfair competition—also does not demand a finding of employment status, because the ARCs are not for-profit commercial businesses, but rather operate for the sole purpose of providing a charitable rehabilitation program for the neediest in their communities, and operate at a deficit. (SOMF ¶ 136.) *See Vaughn I*, 2019 WL 568012, at *8-9 (recognizing that, for the purposes of assessing competitive advantage, work therapy performed by participants of a rehabilitation facility "differs significantly" from work performed by interns for a for-profit commercial business, and therefore "plac[ing] less weight" on this factor in its determination of employment status). As the Seventh Circuit held in *Reed v. Brex, Inc.*, "no legislation pursues its purposes at all costs." 8 F.4th 569, 577 (7th Cir. 2021) (citation omitted). And the "cost" here would be high—interfering with, and perhaps ultimately ending, a rehabilitation program that takes thousands of people off the streets and offers a safety net while seeking to teach them to overcome the obstacles that have held them back in life and motivate them to connect with God and find a new path forward.

As demonstrated below, the record developed in this case demonstrates that the rehabilitation of individuals who perform work therapy in the context of TSA's ARC Program bears no resemblance to the traditional employment relationship contemplated by Congress when it enacted the FLSA.

## II.     Courts and Administrative Tribunals Have Consistently Found That ARC Beneficiaries Are Not Employees.

Over the decades through which The Salvation Army has carried out its sacred mission, during which time it has taken in and rehabilitated many thousands of individuals otherwise left behind by society, numerous courts and agency tribunals have rejected employment-related

challenges[23] that take aim at the work therapy element of the ARC Program. Time and again, and under a variety of statutes and regulatory schemes, courts and administrative tribunals have recognized the common-sense principle that Beneficiaries participating in a charitable, holistic rehabilitation program for their own benefit are not employees. As these decisions consistently recognize, Plaintiffs enroll in an ARC seeking rehabilitation, not employment and compensation, and TSA acts not as the Beneficiaries' employer, but as a faith-based charitable organization providing life-saving support and services, to its own financial detriment (*see* below at Section IV).

Both this Court and the Seventh Circuit recently dismissed claims by former Beneficiaries related to the work therapy component of TSA's ARCs. *Taylor v. Salvation Army Nat'l Corp.,* No. 21-CV-6105, 2022 WL 22861527, at *1 (N.D. Ill. Sept. 19, 2022), *aff'd*, 110 F.4th 1017 (7th Cir. 2024). Although those claims were brought under the Trafficking Victims Protection Reauthorization Act, they alleged a variation on the claims here—that TSA benefitted from the unpaid labor of Beneficiaries, who were forced to work to receive food, clothing, and shelter. *Id.* ("Participants in the ARC program who do not work, or who otherwise violate the rules of the ARC program, may get kicked out of the ARC program, thus losing access to the food and shelter provided under the program."). In affirming dismissal, the Seventh Circuit concluded that the *Taylor* complaint "describe[d] a responsibly run treatment program designed to assist individuals who, in order to rid themselves of an alcohol or drug dependency, need to subject themselves to a safe and disciplined environment free of the distractions that can induce so easily retrogressive behavior."

---

[23] As the Court knows, currently pending are two related coordinated class and collective actions, initiated on the same day by the lawyers litigating this case, which challenge the employment status of Beneficiaries around in the Eastern and Southern Territories. *See Massey v. The Salvation Army, a Georgia Corp.*, No. 1:22-cv-1250 (N.D. Ga., filed July 9, 2022); *Acker v. The Salvation Army, a New York Corp.*, No. 1:22-cv-01968 (S.D.N.Y., filed July 9, 2022). These cases are stayed pending the Court's decision in this case.

110 F.4th at 1031-32. The Seventh Circuit's description of the ARC Program is irreconcilable with Plaintiffs' argument that the ARC creates an employment relationship between TSA and its Beneficiaries.

Just weeks ago, the Southern District of Florida granted summary judgment to The Salvation Army's Southern Territory, holding that the ARC Program is not employment under the FLSA. *Harris v. Salvation Army*, No. 23-cv-61420, 2025 U.S. Dist. LEXIS 56347 (S.D. Fla. Mar. 26. 2025). There, the court granted summary judgment in a case brought by a former beneficiary who opted for his own lawsuit after receiving the collective action notice in the currently-stayed *Massey* action. After weighing the "clear economic reality of the relationship [at issue]," the court found:

> [N]o reasonable juror could conclude . . . that Plaintiff expected to be compensated for his participation in the ARC program. Nor do the benefits that Plaintiff received by way of his Beneficiary status (e.g., housing, clothing, food, counseling, spiritual education, therapeutic functions gained from working, and small weekly gratuity) convert him into an employee within the meaning of the Act. It is Plaintiff who primarily benefited from Defendant's efforts during the course of the ARC program—not the other way around.

*Id.* at \*15, \*20. Although *Harris* arises from the Southern Territory of The Salvation Army, it is undisputed that ARCs nationwide follow the basic policies set forth in the Adult Rehabilitation Centers Handbook of Standards, Principles and Policies. (SOMF ¶ 19.) To that end, the decision equally applies to the issues presented here.

*Harris* followed decades-old authority from the U.S. Court of Appeals for the Ninth Circuit, which rejected a Beneficiary's employment claim under the FLSA nearly 30 years ago under circumstances largely identical to that of Plaintiffs here, affirming the trial court's grant of summary judgment based on a finding that the relationship between The Salvation Army and the Beneficiary was "solely rehabilitative" and that "at no point was there an express or implied agreement for compensation." *Williams v. Strickland*, 87 F.3d 1064, 1068 (9th Cir. 1996). And this

27

holding, which has been cited repeatedly in cases denying the "employee" status of beneficiaries of this and other rehabilitation programs[24]—was buttressed in 2023, when the Superior Court for the County of San Francisco granted summary adjudication to The Salvation Army's Western Territory in a putative class action presenting allegations largely identical to those presented here (and brought by some of the same attorneys as here), under the more expansive definition of "employee" under California's employment law. *Spilman v. The Salvation Army*, No. CGC-21-591364, at 22 (Cal. Super. Ct. Sept. 28, 2023), *appeal pending*[25] ("Plaintiffs voluntarily participated in TSA's residential alcohol and drug rehabilitation programs without any written or implied employment contract providing for renumeration—indeed, pursuant to written agreements that specifically *disclaimed* any employment status—and without any reasonable expectation of receiving compensation for their work.").[26]

Courts and administrative tribunals across the country have also repeatedly found that ARC Beneficiaries are not employees in the context of common law[27] and workers' compensation

---

[24] *See, e.g.*, *Fochtman v. Hendren Plastics, Inc.*, 47 F.4th 638, 645 (8th Cir. 2022); *Vaughn I*, 2019 WL 568012, at *5; *Harris*, 2025 U.S. Dist. LEXIS 56347.

[25] *See* Jackson Decl., App. B.

[26] As in *Harris*, discussed above, although both *Williams* and *Spilman* arise from the Western Territory of The Salvation Army, it is undisputed that ARCs nationwide follow the basic policies set forth in the Adult Rehabilitation Centers Handbook of Standards, Principles and Policies. (SUMF ¶ 19.) To that end, both decisions equally apply to the issues presented here.

[27] State courts, including in Illinois, have found that Beneficiaries are not employees under the common law. In the context of a negligence action brought by a Beneficiary, the First District of the Appellate Court of Illinois determined that the Beneficiary was not an employee. *Johnson v. Salvation Army*, 2011 IL App (1st) 103323, ¶ 22, 957 N.E.2d 485, 491 (2011) ("The work therapy program is not employment and beneficiaries are not paid for their work. Plaintiff voluntarily entered into the rehabilitation program, had a meeting during which Salvation Army counselor St. Julien read the beneficiary's admittance statement out loud to plaintiff, and plaintiff ultimately signed the admittance statement acknowledging that the beneficiary relationship was not an employment relationship."). Similarly, the Fourth District of the Appellate Court of Illinois held that a former Beneficiary was not "wrongfully discharged" because no employment relationship existed. *McKinney v. Castleman*, 2012 IL App (4th) 110098, ¶ 18, 968 N.E.2d 185, 190 (2012) (finding *Johnson*, 2011 IL App (1st) 103323, to be "persuasive and applicable").

statutes.[28] Notably, these cases rely on facts which are equally relevant to a determination of employee status under the FLSA—namely, that Beneficiaries voluntarily entered a rehabilitation program with the understanding that such program was not employment, with no expectation of compensation, and were the primary beneficiary of the relationship.[29]

This Court, therefore, need not break new ground to conclude, on summary judgment, that a Beneficiary in TSA's rehabilitation program who performs work therapy is not an "employee" of TSA. Granting summary judgment here would be entirely consistent with the case law cited above recognizing that the ARC Program is a charitable rehabilitation program that provides a safe and secure environment and consists of various elements designed to help Beneficiaries get back on their feet through structure, discipline, and prayer.

## III. The Economic Reality of the ARC Reflects a Rehabilitative Relationship Between Beneficiary and Benefactor; Not Employee and Employer.

The Seventh Circuit has adopted a "flexible" approach to examine "the economic reality of the alleged employment relationship," and has "declined to apply multifactor tests in the

---

[28] *See, e.g.*, Jackson Decl., App. C, M*cKinney v. The Salvation Army*, No. 08-WC-41928 at 7 (Ill. Workers' Compensation Commission, Feb. 2, 2009) (finding that the gratuity was not "suggestive of a substantial and long-term employment situation" and the "only rational explanation for the petitioner's remaining with the Salvation Army was his need for charitable and therapeutic aid, not any desire for productive employment or ability to practice a trade" where petitioner "sought aid from the Salvation Army for his alcoholism"); *Oaks v. Salvation Army*, IC 90-713791 at 24 (Id. Industrial Commission, Dec. 15, 1993) (finding "[t]he beneficiaries profit primarily from the work therapy segment of the program (in conjunction with the counseling, housekeeping and group support system) by re-establishing basic life-style disciplines such as not drinking to be able to function properly, maintaining an acceptable personal appearance, showing up for work daily and not quitting work when tempted to return to drinking or drugs"); *Pope v. The Salvation Army*, No. 2002-40978 at 34 (N.J. Work. Comp. Bd. 2007) (noting that "[t]he main purpose of this whole program was counselling and trying to help the petitioner overcome any drug or alcohol problems. It was not to provide a service to The Salvation Army. The work therapy program was part of the therapy situation and not an employment situation"). For ease of the Court's review, these cases, as well as a compilation of 12 other such decisions are provided in the attached Appendix C.

[29] Although these cases are not decided under the FLSA, this Court should still consider them as persuasive on the issue of employment status. *See, e.g.*, *Berger*, 843 F.3d at 292-93 (considering outcome of workers' compensation cases in analysis of whether student athletes should be considered employees under the FLSA).

employment setting when they 'fail to capture the true nature of the relationship' between the alleged employee and the alleged employer." *Berger*, 843 F.3d at 291 (citations omitted.) Here, the "true nature of the relationship" between Plaintiffs and TSA is not employee and employer, but rather "Beneficiary" and benefactor.

As explained above, TSA is not in the "business" of running thrift stores, as the Plaintiffs would ask the Court to believe, it is in the business of salvation—saving people both spiritually, through its "divine command to save souls" by exposing men and women who have been rejected by society and untouched by ordinary religious efforts to the Gospel, and physically, by providing Beneficiaries with a warm place to sleep, food to eat, clothing to wear. (SOMF ¶¶ 5, 15.) It further pursues this goal of salvation with work therapy to keep Beneficiaries occupied and away from temptations and to teach them skills, and with classes and counseling to help them overcome obstacles, such as addictions, and to help them set and achieve goals to better their lives. (SOMF ¶ 62.) TSA offers this program, generally free of charge, not for any economic purpose, but because the ARCs are an essential part of The Salvation Army's faith; they are the vehicles whereby Salvation Army Officers practice and preach their religion and express their religious beliefs. (*See, e.g.*, SOMF ¶¶ 1, 11, 15.) To the extent that the work therapy component has an economic effect on TSA, that effect is incidental and purely secondary to the primary goal of TSA in operating the religious and charitable ARC Program to help those most in need. (SOMF ¶¶ 1, 11, 15.) That economic reality, in which TSA provides a rehabilitative program at no or minimal cost to Beneficiaries, and uses any and all of the incidental monetary benefit derived from the work therapy portion of the program to further the program itself, bears no resemblance to employment.

In *Berger*, the Seventh Circuit also considered the "long-standing tradition" of amateurism that "defines the economic reality of the relationship between student athletes and their schools."

30

843 F.3d at 291. Here, it is the long and respected tradition of work therapy rehabilitation programs that undergirds the economic reality of the relationship between TSA and its Beneficiaries. (SOMF ¶ 69.) The U.S. government has long recognized that therapeutic work activity plays an important role in rehabilitation and is distinctly different from employment, as is evidenced by the enactment of work therapy programs intended to benefit veterans in the 1960s. (SOMF ¶¶ 72-74.) Importantly, such programs were *not* deemed to be employment, and in fact, payments in those programs were explicitly intended as incentives, and not as "wages" or gainful employment. (SOMF ¶ 74.) Thus, to consider the ARC Program employment merely because it includes a work therapy component, as Plaintiffs would have the Court do in this case, would upend 200 years of a tradition of work therapy as a rehabilitative activity. (SOMF ¶ 68.)

A.    <strong><u>An Objective Evaluation of the ARC Program as a Whole Confirms That Beneficiaries Are Not Employees Under the FLSA.</u></strong>

This case is ripe for summary judgment because there is no genuine dispute regarding the material facts that underlie the relationship between TSA and its Beneficiaries. An objective evaluation of those facts, which include basic policies and practices applicable to all and undisputed by Plaintiffs, reflects a rehabilitation program, not employment.

As Plaintiffs have admitted, Beneficiaries enroll in the ARC Program for their own benefit, often seeking help in overcoming substance abuse. (*See, e.g.*, SOMF ¶¶ 22, 84, 88, 93-94, 99, 101.) They do not fill out an employment application and are not required to have any work experience or skills—they are taken in merely because they sought help, with the only requirements that they be willing and able to participate in all aspects of the Program and follow all rules. (SOMF ¶¶ 26, 29-32, 35-37.) At the outset of the Program, Beneficiaries complete both an intake and an orientation, providing them with a complete understanding of the requirements and expectations of the Program. (SOMF ¶¶ 26, 33.)

31

Once in the Program, Beneficiaries have access to a safe sober living facility, under the supervision of TSA Officers and administrative staff, three meals a day, and clothing. (SOMF ¶ 5.) Their daily routine—from the time they wake up until the time they go to sleep—is set for them. They attend daily devotions in the morning, engage in work therapy during the day, and participate in a variety of spiritual counseling, worship, classes, and 12-step meetings in the evenings. (SOMF ¶¶ 55-57, 62, 76.) Each of these activities is mandatory, leaving Beneficiaries very little idle time, as such idleness can be dangerous for individuals recovering from an addiction. (SOMF ¶¶ 13, 60, 78.)

An objective evaluation of these basic, undisputed facts confirms that TSA's "'control' over [Beneficiaries] does not stem from any remunerative relationship or bargained-for exchange of labor for consideration," but from the nature of a rehabilitative program itself, wherein a participant must submit to the structure, rules, and activities imposed upon him in order to rid himself of the addictive and harmful cycles that previously controlled him. *Vanskike*, 974 F.2d at 809. Indeed, as with the prison relationship in *Vanskike*, the "control that [TSA] exercises over a [Beneficiary] is nearly total, and control over his work is merely incidental to that general control." *Id.* For the period that they are in the Program, Beneficiaries voluntarily[30] cede control over almost every aspect of their daily lives to the ARC Program in pursuit of rehabilitation. This undisputed material fact is entirely inconsistent with an employment relationship.

B. **Plaintiffs Were the Primary Beneficiaries of Their Relationship with TSA.**

While the Seventh Circuit has not, as have some other Circuits,[31] adopted a specific

---

[30] Some Beneficiaries are in fact required by court order to participate in the Program, but they are excluded from the collective and class definition in this case. Plaintiffs at issue here all participated in the Program voluntarily and were free to leave at any time. (SUMF ¶ 24.) *See* Mot. for Class Certification at 1-2.

[31] *See, e.g.*, *Glatt*, 811 F.3d at 535-36, 538; *Schumann*, 803 F.3d at 1212-1213.

multi-factor test for determining the primary beneficiary, it has "recognized the utility of the 'primary beneficiary' test[.]" *Doe I v. Univ. of Illinois*, No. 18-CV-2227, 2018 WL 11507775, at *3 (C.D. Ill. Dec. 21, 2018) (citing *Hollins*, 867 F.3d at 836); *see also Clancy v. Salvation Army, No. 22 CV 1250, 2023 WL 1344079*, at *3 n.5 (N.D. Ill. Jan. 31, 2023) (citing *Hollins* for the proposition that courts have "applied some version of a primary beneficiary test" and noting that "comparing the benefits that each party received is a useful guide to the economic reality" of a case like this). The Seventh Circuit has also cited with approval what the Second Circuit has deemed "three salient features" of the primary beneficiary test: (1) it focuses on what the individual received in exchange for the work; (2) it accords the courts the flexibility to examine the economic reality of the relationship between the alleged employer and the individual; and (3) it acknowledges that the relationship should not be analyzed in the same manner as the standard employer-employee relationship because the individual enters into the relationship with the expectation of receiving benefits that are not necessarily expected with all forms of employment. *See Hollins*, 867 F.3d at 836 (citing Glatt, 811 F.3d at 536). These features, which are integral to the Seventh Circuit's flexible economic realities approach, encourage the Court not just to examine the work aspect of the relationship, but to look to the relationship as a whole when that relationship diverges from the typical employment relationship. *See Vaughn I*, 2019 WL 568012, at *8 (considering such "significant benefits," including being "provided with food, a place to live, therapy, vocational training, and jobs that kept [Plaintiff] busy and off drugs"); *see also Vaughn II*, 957 F.3d at 146; *Harris*, 2025 U.S. Dist. LEXIS 56347, at *25-26 (acknowledging the "benefits of participating in church services, Bible study, classes, sobriety (drugs and alcohol), [and] daily devotions," in addition to "work therapy itself").

      Perhaps more so in this case than any other, there can be no genuine issue of material fact

regarding which party is the "primary beneficiary" of the relationship between TSA and its "Beneficiaries." Whether this Court considers the benefits of the Program as a whole, as have other courts in analogous contexts, or the benefits of work therapy more narrowly, the very premise of the ARC, and indeed the entire religious mission of TSA, revolves around transforming broken and downhearted individuals into self-respecting, productive members of society by providing for their basic physical needs, instilling in them a Christian philosophy of life, and teaching them habits of industry through work therapy. (SOMF ¶¶ 12, 54, 75.) What's in it for TSA? The ability to practice and preach their religion through continuing to provide these religious and charitable services to Beneficiaries. (SOMF ¶¶ 1, 11, 15.)

1. *Beneficiaries are the primary beneficiaries of their relationship with the ARC.*

As the Second Circuit recognized in *Vaughn*, individuals entering a rehabilitation program "enter[] into the relationship with the expectation of receiving … benefits that are not necessarily expected with all forms of employment," and therefore such programs "should not be analyzed in the same manner as the standard employer-employee relationship[.]" *Glatt*, 811 F.3d at 536; *Vaughn II*, 957 F.3d at 145. Here, Beneficiaries enroll in the ARC not for compensation or other benefits typically associated with employment; they seek security, stability, compassion, connection, and the opportunity for self-improvement. (SOMF ¶¶ 22-23, 46; *see, e.g.*, SOMF ¶¶ 84, 88, 94, 99, 101.) The ARC provides just that.

The ARC offers Beneficiaries a cocoon environment where they can truly focus on their own well-being, free of basic worries about day-to-day survival. (SOMF ¶¶ 5, 11-12.) As part of this cocoon, TSA provides safe, sober housing, access to food and drink for breakfast, lunch, and dinner each day, and clothing items (SOMF ¶¶ 5, 47); the opportunity for self-reflection and spiritual and emotional growth via workbooks/journals on a variety of topics including "What Got

34

Me Here," "Chemical Dependency," "Steps to Spirituality" and "Life Management" (SOMF ¶ 61); a listening ear in the form of a spiritual counselor, with whom they meet at least periodically for counseling and spiritual guidance, as well as to set goals, review journals, and discuss progress (SOMF ¶¶ 51, 62); the opportunity for spiritual growth and connection through daily devotions and religious services at least twice a week (SOMF ¶¶ 52-54); addiction recovery resources including 12-step meetings and sponsorship (SOMF ¶¶ 56-57, 61); and other classes on a variety of self-improvement topics, including "Fatherhood," "Life Skills," "Anger Management," "Computer Skills," "Job Readiness," and "Career Portfolio Development." (SOMF ¶¶ 55, 57.)

Even Named Plaintiffs, who have every incentive in this litigation to portray the ARC in the worst possible light, have been unable to deny the positive, and lasting, effects of the rehabilitative benefits provided by TSA. Plaintiff Peters' spiritual journey at the ARC helped him recover from his addiction and rebuild his relationship with his daughter, and Plaintiff Patton described the ARC's role in helping him "bounce back" and "get [his] life back on track." (SOMF ¶¶ 97, 104.) Plaintiff Love similarly cited meals, access to mental health services, and spiritual guidance at the ARC as having a positive effect on his life and sobriety. (SOMF ¶ 91.) This testimony is entirely consistent with the additional testimonials in Exhibits 67 and 255-258 (*supra* at 16). (SOMF ¶¶ 105-109.)

Various Named and Opt-in Plaintiffs have admitted in discovery to receiving significant benefits from the ARC Program, including:

- The ARC removed access to drugs and alcohol from their environment and helped them to get sober (SOMF ¶ 110);

- The ARC connected Beneficiaries with a community of other individuals with a shared goal of sobriety (SOMF ¶ 110);

- The ARC provided a structured environment that kept them busy and was helpful to their recovery (SOMF ¶ 111);

- The ARC provided spiritual counseling and classes that many Plaintiffs found helpful (SOMF ¶ 112);

- The ARC connected Beneficiaries with health and medical resources to which they had not had access before enrolling (SOMF ¶ 113);

- The ARC helped Beneficiaries with ongoing legal issues (SOMF ¶ 114);

- The ARC helped Beneficiaries apply for government benefits (SOMF ¶ 115);

- The ARC helped Beneficiaries develop or restore their spirituality and relationship with God (SOMF ¶ 116);

- The ARC helped Beneficiaries restore their relationships with their families (SOMF ¶ 117); and

- The ARC helped Beneficiaries find housing or employment before leaving the Program (SOMF ¶ 118).

Demonstrative of the life-changing impact of the ARC, no fewer than ten Named and Opt-in Plaintiffs who were deposed testified that they had remained sober since their last enrollment in the ARC Program. (SOMF ¶ 110.) Many others found more secure or better paying employment after leaving the Program, with many earning more than they ever had prior to enrollment. (SOMF ¶ 119.)

It is also worth noting that many Beneficiaries, including some members of the putative class, have enrolled in the ARC as the result of a Court order, either as an alternative to jail, a requirement of parole or probation, or some other mandatory arrangement. (SOMF ¶ 24.) Although these "justice-referred" stays are not included within the class definition, the very fact that the

justice system across the states holds the ARC Program in high esteem and considers it to be a legitimate rehabilitation program indicates that the Program is far from the exploitative employment arrangement that Plaintiffs would suggest, but rather is a path toward rehabilitation and a better life.

Beyond the benefits described above, most Beneficiaries obtain additional value from the ARC Program by the sheer fact that, while residing in an ARC, they avoid the increased risk of death they would otherwise face if they continued to live in a state of homelessness or alcohol or drug dependency. The value of statistical life, or "VSL," is an economic method of valuing small changes in risk, as adopted by U.S. federal government agencies, numerous other countries, and international organizations such as the World Bank and the Organization for Economic Cooperation and Development, which consists of 38 countries such as France, Germany, and Japan. (SOMF ¶ 127.) The VSL is calculated using data showing how much an average individual would be willing to pay to reduce risks of death to themselves or how much they would need to be compensated to incur small increases in the risk of death, and is applied by economists as part of a cost-benefit analysis. (SOMF ¶ 126.) For example, a federal agency considering a product safety regulation would use the VSL as part of its assessment of the costs and benefits of enacting such a regulation by determining how many lives would be saved by the regulation. (SOMF ¶ 127.) Relevant here, the VSL—as articulated by TSA's expert economist Dr. Kip Viscusi—is useful in demonstrating the economic value that certain Beneficiaries derive from residing in an ARC beyond room, board, and counseling services.

As Dr. Viscusi's work shows, a Beneficiary whose major life issue was identified at intake as "homelessness" and resided in an ARC for six months derived a monetary value of $93,600 by virtue of not being homeless during that six-month period, and thus avoiding the statistically higher

risk of death that comes from being homeless. (SOMF ¶ 128.) And while Dr. Viscusi only had data available to calculate a certain value for those Beneficiaries who identified as homeless, the VSL methodology also applies to other Beneficiaries who avoided statistically higher risks of death by virtue of residing in an ARC, such as those identifying as addicted to drugs or alcohol. (SOMF ¶ 128.)

Importantly for purposes of summary judgment, Plaintiffs offered no rebuttal expert testimony. While they quibbled (at his deposition) with the values Dr. Viscusi concluded certain Beneficiaries realized by virtue of residing in an ARC, they offered no competing expert testimony or other evidence to create a genuine issue as to the soundness of the VSL methodology or Dr. Viscusi's conclusion that Beneficiaries realized meaningful economic value by avoiding higher risks of death associated with homelessness and addiction.

The benefits discussed above are entirely different from the benefits that would be expected or provided in an employment relationship. Moreover, the very suggestion that an employer could require its employees to attend twice weekly religious services or participate in programming that fills nearly every waking hour demonstrates the absurd outcomes that would result from applying traditional employment laws to a faith-based rehabilitation program. The work therapy component is only one component of a multi-faceted, holistic rehabilitation program and does not equate to an employment relationship.

2. *Beneficiaries are the primary beneficiary of the work therapy aspect of the Program.*

Even if this Court considers only the work therapy component of the Program, Beneficiaries are still the primary beneficiaries. Work therapy is itself a rehabilitative service that is intended to, and does, benefit the Beneficiaries. As discussed above, work therapy is widely acknowledged, including by the United States government, as an effective therapeutic activity, including for drug

and alcohol rehabilitation, and has been utilized for over 200 years. (SOMF ¶ 68.) As provided in the expert report of Dr. Morris Bell, a professor, Senior Research Scientist, and clinical psychologist, work therapy provides Beneficiaries with a "work-structured day," wherein the "individual's daily routine involves engagement in productive activity with expectations for social behavior in conformance with the worker's role." (SOMF ¶ 68.) Such routine "expands an individual's opportunities to develop social connections around common purpose and productive goals," helps to develop social skills, and is "physically activating" and "cognitively stimulating." (SOMF ¶ 69.) Work therapy is particularly beneficial as it provides the opportunities to practice "executive functions and other neurocognitive and social cognitive functions that are often compromised by mental illness and/or substance abuse, including "self-monitoring, impulse inhibition, planning, sequencing, and self-organization." (SOMF ¶ 69.) "Motivation to succeed at work therapy may also help participants be contributing members of their families, and in conjunction with church and other organizations, contributing members of their larger community." (SOMF ¶ 70.) Work therapy can also help an individual to "discover or rediscover worthwhile features of themselves and begin to create a more integrated narrative of their recovery and their lives." (SOMF ¶ 70.) Notably, Dr. Bell's research at the U.S. Department of Veterans Affairs focusing on the benefits of work therapy on outpatient populations with psychotic illness and/or substance abuse found that there was a "direct linear relationship between clinical improvements and weeks of work over a six-month work program," even where no additional community or therapeutic benefits were provided. (SOMF ¶ 71.)

It is telling that even some Plaintiffs who now seek compensation have attested to the positive effects of work therapy. For example, Named Plaintiff Clancy found that work therapy helped him establish the habit of punctuality; Opt-in Plaintiff Poynter liked his work therapy assignment at the

front desk because it allowed him to relate to other people and help them with their sobriety; Opt-in Plaintiff Ellis saw improvements in his self-discipline, patience, and working relationships. (*See* SOMF ¶ 129.) Other Beneficiaries also have found work therapy to be essential to their recovery and future success:

- Work therapy helped Rick Loftus to relearn his work ethic, develop interpersonal relationships, and develop humility. He describes working in the clothing room at the ARC as "one of the best things that happened to me." (SOMF ¶ 120.)

- DeMarcus Teamer describes work therapy as one of "[t]he most helpful components of the program for my recovery." His assignment at the front desk gave him the opportunity to help others, and it helped him learn to communicate with people. He also learned how to accept responsibility for his actions. (SOMF ¶ 121.)

- Ryan Berg appreciated that work therapy helped to keep him occupied and felt that having that structure helped him to focus on the four hours of other rehabilitative programming after work therapy. (SOMF ¶ 122.)

- Work therapy gave Stephen Day a sense of progression and purpose in his everyday life. It provided him with a schedule, which he desperately needed after feeling aimless amidst his addiction. Mr. Day still uses the lessons he learned from work therapy in his work today, including how to take care of problems as they arise, how to work in a team, and how to manage stress. (SOMF ¶¶ 123-24.)

- Ken Osborn considers work therapy "critical to [his] recovery." Work therapy taught him integrity, and the importance of doing the right thing even when nobody is looking. (SOMF ¶ 125.)

These accounts, which represent just a few of countless examples that TSA could provide,

demonstrate the vast difference between the ARC Program and employment. Whereas in a typical employment relationship, the economic reality is that employees serve their employer, the so-called "economic reality" of the relationship between TSA and its Beneficiaries is that the ARC Program exists to serve, and to save, its Beneficiaries.

C.    **Plaintiffs Had no Expectation of Compensation in Enrolling in a Rehabilitation Program.**

1.   *Plaintiffs understood that they were enrolling in a rehabilitation program and would not be paid for work therapy.*

Under *Walling*, and the case law presented above, Plaintiffs cannot prevail unless they can prove that they had an "expectation of compensation[.]" 330 U.S. at 152. It is undisputed that the Beneficiaries knew (1) that they were enrolling in a rehabilitation program; (2) that they would be required to participate in work therapy, in addition to worship, counseling, and classes; and (3) that they would not be paid for performing work therapy. Any attempt by Plaintiffs to deny these basic facts is belied by Plaintiffs' explicit acknowledgment in their signed admittance statements, as well as by various admissions in discovery. (SOMF ¶¶ 33, 36, 51, 52.)

The Ninth Circuit came to the same conclusion in *Williams*, when it affirmed summary judgment in favor of The Salvation Army's Western Territory, holding that an ARC Beneficiary had "neither an express nor an implied agreement for compensation with The Salvation Army and thus was not an employee." 87 F.3d at 1067. Though the plaintiff belatedly argued that he *believed* he was in an employment relationship with TSA, the court looked to the plaintiff's prior statements, in which he admitted that he enrolled in the ARC for rehabilitative purposes, and to his signed admittance statement as evidence that there was no agreement for compensation. *Id.* The admittance statement stated as follows: "I further understand that under no circumstances can this Center be under any obligation to me; and that I am a beneficiary and not an employee of this Center." *Id.* (*See also* SOMF ¶ 28 (same).) The court further stated that there was no implied

41

agreement for compensation because "Williams did not apply to the personnel department of [T]he Salvation Army, but rather was admitted to the Army's rehabilitation program." 87 F.3d at 1067. As the Ninth Circuit found, these facts "place[d] this case within the holding of *Walling*[.]" *Id.*

Similarly, in *Spilman*, the court found that the plaintiffs had skipped the "key threshold step" of establishing "the existence of an express or implied agreement for compensation," pointing to the signed admittance statement and noting:

> Here, not only is it undisputed that Plaintiffs had no written employment agreement with TSA, they agreed in writing that *they were not employees of TSA at all*, that they were not entitled to receive wages or other compensation, and that the minor gratuities they might receive in addition to room and board were '*not* pay for work done.' While parties may enter into an implied-in-fact contractual understanding, the nature of which must be determined from the totality of the circumstances, '**where the undisputed facts negate the existence or the breach of the contract claimed, summary judgment is proper**.'

*Spilman*, No. CGC-21-591364, at 23 (citations omitted) (emphasis in bold added); *see also Harris*, 2025 U.S. Dist. LEXIS 56347, at *21 (citing plaintiff's admittance statement, along with "other undisputed facts" bolstering "the significance of Plaintiff's express acknowledgment that he was not an employee"). The court further rejected Plaintiffs' argument that TSA's provision of in-kind benefits was intended as implied compensation, finding instead that they were "part and parcel of Plaintiffs' rehabilitation programs, not wages or other 'remuneration.'" *Spilman*, No. CGC-21-591364, at 24. *See also Harris*, 2025 U.S. Dist. LEXIS 56347, at *23-24.

The same facts that the *Harris*, *Williams*, and *Spilman* courts found to be determinative are true here, and likewise negate any argument that Plaintiffs had a reasonable expectation of compensation during their participation in the ARC. Each of the Plaintiffs in this case signed an admittance statement acknowledging:

> I understand that The Salvation Army is a religious and charitable

> organization and that this Adult Rehabilitation Center is dedicated solely to the social and physical rehabilitation and spiritual regeneration of those persons who are in need of such assistance. I further understand that under no circumstances can this Center be under any obligation to me and that I am a beneficiary and not an employee of this Center. I understand that my admission and continued residence is dependent upon my needing such assistance and my willingness to help myself and others so situated, including the voluntary performance of such duties as may be assigned to me."

(SOMF ¶ 28.)

Moreover, even if a Beneficiary somehow believed at the time of intake that they would be compensated for work therapy, and the Beneficiary remained in the Program for weeks or months without receiving any compensation for work therapy, any continued expectation of compensation is objectively unreasonable. Importantly, a significant percentage of Beneficiaries, including four of the five named Plaintiffs, enrolled in the ARC Program *multiple times*, and thus cannot credibly assert that they had a reasonable basis for expectation of compensation upon re-enrollment. (SOMF ¶ 48.)

Plaintiffs will undoubtedly argue that FLSA rights cannot be waived, but this argument begs the very question at issue here—whether Plaintiffs even *had* any FLSA rights to waive. The admittance statement that each one signed is presented not as evidence of Plaintiffs' *waiver* of their rights, but of the fact that they could not have had an *expectation of compensation* when they enrolled in a *rehabilitation program* that they *explicitly acknowledged was not employment*. Under these circumstances, there are no FLSA rights to be waived—they never attached in the first place. *See, e.g.*, *Williams*, 87 F.3d at 1067 ("While FLSA rights cannot be waived, this statement indicates that there was no express agreement for compensation.") (internal citation omitted).

Moreover, during discovery, each of the Named Plaintiffs, as well as many of the Opt-In Plaintiffs, admitted that they knew (or believed) from the start that they were enrolling in a

43

rehabilitation program (SOMF ¶¶ 21, 44), and that their relationship with TSA lacked traditional indicators of employment. (*Compare* SOMF ¶ 42 (no application for employment or offer letter); ¶¶ 41, 43 (TSA never referred to them as employees or told them were going to become an employee); ¶ 46 (never saw ARC advertised as an employment opportunity) *with* SOMF ¶ 49 (Beneficiaries who choose to apply for employment with TSA after graduation are required to submit an application for employment, as with any other applicant).) Each of the Named Plaintiffs also admits that they never asked a TSA employee or officer to pay them an hourly wage for work therapy. (SOMF ¶ 45.) Clearly, Plaintiffs never expected to be paid for their time in an ARC. (SOMF ¶ 45.) These undisputed facts "bolster the significance of Plaintiff[s'] express acknowledgment" and make clear that Plaintiffs had no expectation of compensation when enrolling in the ARC Program. *Harris*, 2025 U.S. Dist. LEXIS 56347, at *21.

> 2. *Plaintiffs' anticipated argument that they expected in-kind compensation as a quid pro quo for work therapy fails as matter of law.*

The ARC is not a homeless shelter, where one comes to seek shelter for a night, and finds oneself back on the streets the following day. The ARC is a holistic residential rehabilitation program comprised of various elements, all of which are essential to instilling in Beneficiaries the ingredients necessary to turn their lives around. Beneficiaries entering the Program understand that they must commit fully to *all aspects* of the Program and the rehabilitative goal around which it is based. They cannot pick and choose which elements of the Program they want to follow; and if the Program is not for them, they are free to leave. (SOMF ¶¶ 14, 29, 35, 50, 78.) *See also supra* n.30. This is true of work therapy, and it is equally true of worship, grooming, classes, and counseling.

In their Motion for Class Certification (at 4-9, 36-37), Plaintiffs contend that they expected, and received, compensation in exchange for work therapy in the form of in-kind benefits, including

housing, food, and rehabilitation services, as well as a small gratuity. This circular argument, constructed for litigation and belied by undisputed facts and Plaintiffs' own deposition testimony, appeals to an interpretation of the phrase "in exchange for" that finds no support in the factual record of this case or the law. By Plaintiffs' presumed argument, the mere fact that work therapy was a required element of the Program means that it was performed in exchange for benefits such as food and shelter. But work therapy was just one element of holistic aspects of the ARC that were required of all Program participants. (SOMF ¶ 14.) Plaintiffs ignore the fundamental fact that every Program element was a necessary condition of the rehabilitation program, and their refusal, or inability, to participate in any element, not just work therapy, could result in discharge from the Program. (SOMF ¶ 77.) *See also Taylor*, 110 F.4th at 1031 ("The Salvation Army is entitled to stop providing food, clothing, and shelter to someone who no longer wishes to participate."); *Harris*, 2025 U.S. Dist. LEXIS 56347, at *23-24 ("And, the undisputed evidence shows that the benefits that Plaintiff received—housing, food, shelter—were just as much dependent on Plaintiff staying sober and complying with other parts of the 'strict schedule' as they were on completion of work therapy.").

While work therapy is a mandatory program element, the receipt of food, shelter, rehabilitative services, and gratuity are in no way conditioned on the performance of work therapy. (SOMF ¶¶ 47, 65.) Various Plaintiffs testified regarding instances when they were unable to perform work therapy, with no allegation that they were kicked out of the Program, or otherwise denied housing, meals and rehabilitative services as a result.[32] Plaintiff Love, for example, missed

---

[32] It is true that TSA has a policy requiring Beneficiaries to make up missed work therapy, though like all policies, this policy is to be applied with compassion and grace, as shown by the exceptions above. (SUMF ¶¶ 47, 77.) Underlying this policy is TSA's belief that work therapy *is therapy*, and is essential to the Beneficiary's rehabilitation. Additionally, this policy helps to ensure that Beneficiaries do not seek to manipulate or abuse the system to bypass the work therapy component. Notably, Beneficiaries may also be required to make up missed classes. (SUMF ¶ 77.)

two weeks of work therapy because of a pre-existing shoulder injury; Opt-in Plaintiffs Richardson and Poynter both missed work therapy because they had to quarantine during the COVID-19 pandemic; and Opt-in Plaintiff Bida missed work therapy to attend mandatory court dates. (SOMF ¶ 47.) *See contra Tony & Susan Alamo Found. v. Sec'y of Lab.*, 471 U.S. 290, 301 n.22 (1985) ("Associates" in program testified that they "were prohibited from obtaining food from the cafeteria if they were absent from work—even if the absence was due to illness or inclement weather.") Additionally, while TSA did its best to keep Beneficiaries occupied in the spring and summer of 2020, most of its warehouse and thrift store-related operations were shut down because of COVID-19, which severely limited the availability of work therapy assignments. (SOMF ¶ 47.) And, despite the shut down, TSA continued to fully provide all other aspects and benefits of the Program during this time. (SOMF ¶ 47.)

Plaintiffs' *quid pro quo* argument is even more tenuous when we consider that during their participation in the ARC many Beneficiaries (including Named Plaintiffs Clancy, Love, Bryant, and Patton, as well as many Opt-In Plaintiffs (SOMF ¶ 20)), turned over their SNAP benefits to The Salvation Army to help "offset the cost of [] room, board, and clothing." *Williams*, 87 F.3d at 1067. As the Ninth Circuit found, the fact that Beneficiaries provided their own benefits to offset the cost of their room and board "strongly counsels against a holding that [they] received the in-kind benefits in exchange for [their] work" and instead suggests that "these benefits were given to [them] to enable [them] to pursue [their] rehabilitation[.]" *Id.* at 1067-68 (finding that this fact "distinguishes this case from *Alamo*"). There is no reason for Plaintiffs to agree to turn over their food stamps to the ARC if they viewed the room-and-board benefits as compensation owed in exchange for work therapy.

In short, Beneficiaries engage in work therapy as part of their rehabilitation journey from

their disaffiliation, to prepare them to reintegrate into society and obtain and maintain employment after they leave the ARC; they do not perform work therapy to receive room and board [and rehabilitative services] as wages in another form. *See, e.g.*, *id.*; *Harris*, 2025 U.S. Dist. LEXIS 56347, at *23-24; *Spilman*, No. CGC-21-591364, at 22 ("The meals, lodging, and minor 'gratuities' that Plaintiffs received do not constitute wages or significant remuneration, but rather are merely incidental to their rehabilitation programs.").

D.    **In Contrast to Alamo, Plaintiffs Were Dependent on TSA Only for the Limited Duration of Their Rehabilitative Journey.**

Plaintiffs have, throughout this litigation, leaned heavily on *Tony and Susan Alamo Foundation v. Secretary of Labor*, 471 U.S. 290 (1985), for support, but given the abundant FLSA and state cases decided in the rehabilitation context, including *Williams* (9th Cir. 1995), *Vaughn* (2nd Cir. 2020), *Fochtman* (8th Cir. 2022), *Harris* (S.D. Fla.), and *Spilman* (CA), all of which post-date *Alamo*, it is evident that *Alamo* cannot bear the weight Plaintiffs place on it. *Alamo* does not dictate a finding of employment status based solely on the fact that Plaintiffs were dependent on TSA during the period of their participation in the Program.

In *Tony & Susan Alamo Foundation*, the Supreme Court distinguished the relationship between the "associates" working for the Alamo Foundation and the trainees in *Walling*, because "the associates were entirely dependent upon the Foundation for long periods, in some cases several years," in contrast to the week-long trainee program at issue in *Walling.* 471 U.S. at 301 (internal quotation marks and citation omitted). The Court held that the Eighth Circuit was not clearly erroneous in finding that, due to the length of the program, "associates must have expected to receive in-kind benefits—and expected them in exchange for their services[.]" *Id.* As support for its finding, the Court also cited testimony from former associates that they "had been 'fined' heavily for poor job performance, worked on a 'commission' basis, and were prohibited from

47

obtaining food from the cafeteria if they were absent from work—even if the absence was due to illness[.]" *Id.* at n.22. The Court found that such an arrangement created an implied agreement for compensation.

In *Williams*, the Ninth Circuit directly addressed and distinguished the circumstances of the *Alamo* associates from the rehabilitation program offered by The Salvation Army to its Beneficiaries. Where the associates in *Alamo* committed themselves to living and working at the Foundation indefinitely, with no specific end-goal,[33] ARC Beneficiaries enroll in a six-month program that allows Beneficiaries to "remain in the work-therapy program long enough to overcome their substance abuse problems and gain the necessary work-related skills to reenter the marketplace." *Williams*, 87 F.3d at 1068. The Ninth Circuit noted that "[w]hile six months is longer than the one-week period in *Walling*," the dependency concerns are not the same because "the Beneficiaries have significantly different needs from those of the railroad trainees and six months is not an unreasonable time commitment to treat these needs." *Id.*

The Ninth Circuit's analysis is equally applicable to TSA's program here. And indeed, the extensive discovery in this case shows a rehabilitation program that is entirely distinct from the facts presented in *Alamo*: TSA provides a comprehensive rehabilitation program, complete with worship, spiritual counseling, classes, and 12-step meetings, lasting for a limited duration (approximately six months), during which time Beneficiaries are expected and encouraged to meet specific objectives (both those set by the Program as well as individual goals set by the Beneficiary). (SOMF ¶¶ 8, 55-56, 57.) Unlike the plaintiffs in *Alamo*, Beneficiaries know they cannot expect TSA to provide food and shelter indefinitely in exchange for work—they are aware

---

[33] *See Donovan v. Tony & Susan Alamo Found.*, 567 F. Supp. 556, 563 (W.D. Ark. 1982), *modified*, No. CIV. 77-2183, 1983 WL 1982 (W.D. Ark. Feb. 7, 1983), *and aff'd in part, vacated in part*, 722 F.2d 397 (8th Cir. 1983), *aff'd sub nom. Tony & Susan Alamo Found. v. Sec'y of Lab.*, 471 U.S. 290 (1985) ("In many respects, the Foundation is operated as a commune.").

from the beginning that their objective is to progress through the six-month Program, and they are encouraged to continue their journey through small weekly gratuities, until their successful graduation. (SOMF ¶ 65.) Beneficiaries do not agree to perform work therapy because they need compensation to provide for their basic needs. Rather, the ARC provides for their basic needs during this time *as a matter of Christian charity* and to enable Beneficiaries to focus on their recovery. (SOMF ¶¶ 5, 12.) And, far from encouraging continued dependence, TSA celebrates the graduation of each Beneficiary, honoring the Beneficiaries who have made the commitment to improve their lives and inspiring those still in the Program to continue on and achieve their goals.[34] (SOMF ¶ 18.)

Where the associates in *Alamo* testified that they worked on a "commission" basis (471 U.S. at 301 n.22), no such work-related payment exists in the context of the ARC. (*See* SOMF ¶ 65 (gratuity not tied to the quality or quantity of work therapy).) And as discussed earlier, many Beneficiaries, including Plaintiffs Clancy, Love, Patton, and Bryant, donated SNAP benefits to the ARC, which weighs against a finding of implied agreement for compensation. *See* Section III.C.2 (citing *Williams*).

These circumstances do not establish an implied agreement for compensation, as was found in *Alamo*, but rather support *Williams'* finding that the relationship between Beneficiaries and the ARC is "solely rehabilitative."

## IV. The ARCs Operate at a Deficit.

The thrift stores exist only to convert donated goods into cash to pay the operating expenses of providing the rehabilitation program at the ARCs; as such, without the need to support the

---

[34] It would, of course, be a poor business model for an organization to celebrate the departure of its most able employees and to push them out as they gain experience and skills.

ARCs, there would be no need for the thrift stores. (SOMF ¶¶ 131, 133.) And, as a testament to the sincerity of its religious and charitable mission, TSA has continued to provide the religious and charitable Program at its ARCs even though the ARCs, even with the revenue from their thrift stores, consistently operate at a deficit. (SOMF ¶ 136.)[35] And yet, rather than closing its doors to those who are hungry, unhoused, and suffering from addiction or other disaffiliation, TSA subsidizes the Program with other charitable contributions, to ensure that the Program remains open and available to all. (SOMF ¶ 136.) TSA's only "economic" motive is to keep the ARCs afloat and continue to fulfill the ARCs' sacred mission.

Plaintiffs fundamentally distort this arrangement, claiming that it is TSA, not Beneficiaries, who reaps significant financial benefits from the work therapy of Beneficiaries. Plaintiffs are mistaken. At most, some work therapy assignments benefit TSA by facilitating the resale of donated items. But any such "benefit" is secondary to the true mission and purpose of the ARC Program, which is to lift up the Beneficiaries through rehabilitation. (Importantly, it is undisputed that certain work therapy assignments have nothing to do with the sale of donated goods or production of revenue, such as cleaning in the residential part of the ARC and working in the kitchen or at the front desk of the Center. (SOMF ¶ 79.) Moreover, very few work therapy assignments are based in the thrift stores that are part of the ARCs; instead, they take place in the warehouse, on the loading dock, and, as mentioned, in the ARC residence itself. (SOMF ¶ 79.) And critically, again, any revenue derived from the sale of donated goods, whether attributable to the jobs performed by employees or those more menial tasks performed by Beneficiaries as part of their work therapy, is used to sustain the ARC program on a charitable basis, i.e., *for the benefit of the Beneficiaries*. (SOMF ¶¶ 133-134.)

---

[35] Indeed, as mentioned earlier in Section III.C.2, the ARCs continued to operate and serve their Beneficiary populations even when the thrift stores were shut down due to the COVID-19 pandemic. (*See* SUMF ¶ 47.)

Simply put, the relationship between the parties was created because Plaintiffs chose to pursue their own rehabilitation by enrolling in the ARC Program. The sole purpose of the ARC Program is to provide Beneficiaries with the opportunity to focus on their recovery; address the sources of their disaffiliation; develop soft skills including work ethic, discipline, and responsibility; and establish or deepen their relationship with God. Plaintiffs without question "work[ed] for their own advantage" and are the primary beneficiaries of their relationship with TSA. *Walling*, 330 U.S. at 152.

## V. The Subjective Experiences of Plaintiffs, Presented in Litigation, Do Not Create a Genuine Issue of Material Fact Regarding the Primary Beneficiary Issue.

Even if Plaintiffs, in litigation, opt to paint the Program in a poor light, summary judgment is still proper here, where Plaintiffs have admitted that they sought to enroll in the ARC for rehabilitation, not for compensation, where they admit to benefits gained in the Program, and where the Program exists solely to carry out TSA's mission to serve the Beneficiaries.

In addition to providing much-needed structure to keep Beneficiaries occupied (itself an essential component of recovery), work therapy provides Beneficiaries with the opportunity to develop general work skills, including self-sufficiency, discipline, self-esteem, and responsibility. (SOMF ¶ 75.) These skills are crucial to overcoming addiction and becoming a productive member of the workforce. (SUMF ¶¶ 69-70.) To address Plaintiffs' subjective complaints about work therapy,[36] the Court can look to *Vaughn I* for guidance. There, Vaughn argued that the program was not beneficial to him, noting that his work was "often unsupervised and exhausting, and that it at times interfered with his ability to attend therapeutic sessions, thereby adversely affecting his efforts to obtain the therapy he needed to lead a drug-free life." *Vaughn I*, 2019 WL 568012, at *9

---

[36] *See* Mot. for Class Certification at 10-11 (describing work therapy assignments as "nonvocational drudgery" and "frequently physically demanding").

(quotations omitted). Despite these arguments, the court dismissed Vaughn's gripes about the program, noting that "[e]ven if Vaughn's work was exhausting and unsupervised, it still afforded him the significant benefits," including "food, a place to live, therapy," and "jobs that kept him busy and off drugs." *Id*. at *8-9.

TSA does not deny that work therapy could entail hard work. But as in *Vaughn I*, even if Plaintiffs here found work therapy to be "unsatisfactory," the ARC provided them with "significant benefits." And, even if Plaintiffs "may have preferred to acquire skills that could translate into stable (i.e., not menial, low wage) employment, the jobs [they were] assigned undoubtedly furthered the development of the skill of self-sufficiency, which could be expected to facilitate [their] transition to a drug-free life." *Id*. at *8 (internal quotation marks and citations omitted). Here too, regardless of whether Plaintiffs learned specialized skills that could carry over into a career, they learned (or perhaps re-learned) to report to a job on time, follow directions, work with others, stay focused, and to accomplish a task. (SOMF ¶ 129; *see also* ¶¶ 69-70, 75.) These skills alone are significant for Beneficiaries who have long struggled to secure and maintain employment. Indeed, the work ethic and skills learned at the ARC likely enabled Named Plaintiff Clancy to work 40 hours per week for the first time in 20 years after his participation in the ARC Program, and also equipped Named Plaintiff Love to work a job where he earned more money than he had ever earned in his life before enrolling in the ARC. (SOMF ¶¶ 87, 92.)

As the court stated in *Harris*, "[e]ven accepting that as true" the plaintiff's statements that the work was difficult at times and that he could be kicked out if he did not work, "such a reality does not call into question the undisputed evidence regarding the lack of any express or implied agreement for compensation, the non-monetary/in-kind benefits that Plaintiff received as a Beneficiary of the ARC program, or Plaintiff's own understanding that he was entering a

free-of-charge rehabilitation program that he had already attended." 2025 U.S. Dist. LEXIS 56347, at *27-28. And these facts alone are sufficient to support granting summary judgment.

In their Motion for Class Certification (at 26-27), Plaintiffs criticize the quality of the rehabilitative services, pointing to the amount of time allocated to work therapy compared to other therapeutic activities. Such criticism, however, misses the point: the ARC Program is built on the premise that *work therapy is therapy*. (SOMF ¶ 75.) It is not merely intended to fill the day, though that has its benefits too. *See Vaughn I*, 2019 WL 568012, at *8 (citing "jobs that kept [Vaughn] busy and off drugs" as a significant benefit of the program). Indeed, the long-standing tradition of work therapy supports the notion of work therapy as a crucial and widely accepted rehabilitative activity.[37] Therefore, the fact that work therapy comprises a significant portion of the Beneficiaries' day is not evidence that Beneficiaries are working for TSA's benefit. Rather, it is evidence that Beneficiaries are engaging in therapeutic activities and gaining the well-established benefits of a work-structured day.

Additionally, to the extent Plaintiffs argue that the ARC Program is not a licensed drug and alcohol rehabilitation treatment center and does not provide certain addiction treatments (Mot. for Class Certification at 20), this is, again, by design, and does not create a genuine issue of material fact. TSA is, and always has been, a religious organization, and accordingly, the ARC is, and always has been, a faith-based, non-clinical rehabilitation program. (SOMF ¶¶ 1, 3, 10-11, 14-15.) Beneficiaries are informed of the nature of the Program when they enroll and can choose another rehabilitation program if the faith-based program offered by the ARC does not provide their

---

[37] In their Motion for Class Certification (at 21), Plaintiffs cite their expert, Dr. Margaret Jarvis, for the proposition that "work therapy is not an effective treatment or therapy in addressing substance use disorders." Significantly, Dr. Jarvis is an expert in "addiction *medicine*," a field that is entirely unrelated to the form of rehabilitation that TSA provides; while TSA's own expert, Dr. Bell, has spent his career studying and developing work therapy programs, particularly in individuals suffering from substance abuse and other disorders.

preferred type of treatment. (SOMF ¶¶ 25-26, 30.) And some Plaintiffs, including Named Plaintiffs

Clancy, Love, Peters, and Patton, as well as various Opt-in Plaintiffs, have testified that their time

at the ARC helped them to grow in their faith and spirituality, which also helped them maintain

their sobriety. (SOMF ¶ 116.)

## VI. Plaintiffs' State Law Claims Fail for the Reasons Discussed Above.

Plaintiffs have pled claims under Illinois, Michigan, and Wisconsin state wage and hour

laws. It is undisputed that the Illinois and Michigan laws closely mirror the FLSA, and therefore

while TSA's arguments focus on the FLSA, they apply equally to these state law claims. *See, e.g.*,

*Haynes v. Tru-Green Corp.*, 154 Ill. App. 3d 967, 977, 507 N.E.2d 945, 951 (1987) ("The Illinois

law parallels the Federal law."); *Callahan*, 78 F.Supp.3d at 821 ("Because the IMWL parallels the

FLSA so closely, courts have generally interpreted their provisions to be coextensive, and so have

generally applied the same analysis to both."); *Dikker v. 5-Star Team Leasing, LLC*, 243 F.Supp.3d

844, 854 n.3 (W.D. Mich. 2017) ("[T]he FLSA and Michigan Workforce Opportunity and Wage

Act minimum wage and overtime provisions 'largely parallel each other'") (quoting *Arrington v.

Mich. Bell Tel. Co.*, 746 F.Supp.2d 854, 858-60 (E.D. Mich. 2010)); *Clancy*, 2023 WL 1344079,

at *2 ("An allegation of an employment relationship is also a requirement for plaintiffs' state-law

claims, and the parties agree that the analyses under Illinois and Michigan law are the same as

under the FLSA.").[38]

Here, Plaintiffs bring a claim under Wisconsin's minimum wage law, Wis. Stat. § 104.02,[39]

for which an "employee" is defined as "every individual who is in receipt of or is entitled to any

---

[38] *See also* 2023 WL 1344079, at *2 (acknowledging that "the parties agree that the analyses under Illinois and Michigan law are the same as under the FLSA" and collecting cases).

[39] Plaintiffs also bring a claim under Wis. Stat. § 109.03. The relevant portion of the definition of "employee" applicable to this provision is in fact identical to the FLSA: "[A]ny person employed by an employer[.]" Wis. Stat. § 109.01.

compensation for labor performed for any employer," subject to certain statutory exclusions that are inapplicable here. Wis. Stat. § 104.01(2)(a). While Wisconsin courts have not "expressly indicate[d]" that its state minimum wage provisions should be interpreted to conform with the FLSA (*Brant v. Schneider Nat'l, Inc.*, 43 F.4th 656, 673 (7th Cir. 2022)), other case law interpreting this provision in an analogous context indicates that the same analysis and outcome would apply here.[40] For example, the Wisconsin Court of Appeals has previously held that patients civilly committed to a secure treatment facility who performed "therapeutic labor" as part of their program are "not intended to be and are not employees under Wis. Stat. ch. 104, Wisconsin's minimum wage law." *State ex rel. Hung Nam Tran v. Speech*, 782 N.W.2d 106, 111 (Wis. Ct. App. 2010). The appellate court relied on Seventh Circuit case law, including *Sanders v. Hayden*, 544 F.3d 812 (7th Cir. 2008), which similarly held that persons civilly committed are not covered by the FLSA. *Id.* at 110-11. Specifically, the appellate court agreed with the Seventh Circuit that civilly committed individuals "do not need the minimum wage to protect their well being and standard of living" because they are cared for within the confines of the program. *Id.* at 111. *See also id.* at 110 (citing *Bennett*, 395 F.3d at 410 that the goals of putting imprisoned people to work to "keep them out of mischief, or to ease their transition to the world outside, or to equip them with skills and habits that will make them less likely to return to crime outside" are not compatible with federal regulation of wages and hours). Based on the foregoing, Beneficiaries are not "in receipt of" or "entitled to any compensation for labor," and are thus not employees under Wisconsin law.

---

[40] In their Motion for Class Certification (at 43), Plaintiffs cite *Brant* for the proposition that "Wisconsin employs a 'control' test for determining whether workers are employees for purposes of the state's minimum wage law." *Brant* involved analysis of whether a worker was an independent contractor or an employee, and therefore the "control" test (which traditionally applies to independent contractor cases) was proper. Nothing in *Brant* suggests that the control test is the proper test to be applied here, and as Plaintiffs acknowledge, "there is a paucity of authority setting forth the proper test for employment under Wisconsin law." *Id.*

**VII.    Plaintiffs Cannot State a Claim That TSA Willfully Violated the FLSA.**

Even if this Court were to determine that Plaintiffs have pled a genuine issue of material fact that they are employees, such violation cannot be deemed willful. To prove willfulness, Plaintiffs must show that TSA "either knew or showed reckless disregard for the matter of whether [their] conduct was prohibited by the statute[.]" *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). As this Court recognized in its Order on TSA's motion to dismiss, "the flexible standard for what constitutes an employment relationship in the Seventh Circuit and the fact that persuasive authority (including *Williams*) supports the proposition that work performed as part of rehabilitation programming is not employment under the Act," supports a finding that TSA did not act willfully in failing to classify Beneficiaries as employees. *Clancy*, 2023 WL 1344079, at *5. The evidence adduced in discovery has presented no genuine issue of material fact regarding TSA's willfulness. If anything, the evidence is conclusive that, at all times, TSA reasonably believed that its rehabilitation program did not constitute employment, and this belief was buttressed time and again by favorable court decisions, including in *Williams, Spilman, Harris*, and various workers' compensation cases. The evidence also demonstrates that TSA complied with the FLSA for its acknowledged employees, and that it made every effort to ensure that its ARC Beneficiaries understood the rehabilitative nature of the Program and had no expectation of compensation. Given this, TSA clearly showed no "reckless disregard" for its obligations under the FLSA, but instead reasonably believed the Program was not covered.

**CONCLUSION**

For the foregoing reasons, TSA respectfully requests that the Court grant it summary judgment and dismiss the Plaintiffs' Second Amended Complaint, with prejudice.

Dated: April 18, 2025.        Respectfully submitted,

*/s/ Amy M. Gibson*
Amy M. Gibson (IARDC No. 6293612)
Aronberg Goldgehn
225 W. Washington, Suite 2800
Chicago, Illinois 60606
312-828-9600
agibson@agdglaw.com


*/s/ Toni Michelle Jackson*
Toni Michelle Jackson (D.C. Bar No. 453765)
Thomas P. Gies
Andrew W. Bagley
Katie R. Aber
Rachel S. Lesser
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 624-2500
TJackson@crowell.com
TGies@crowell.com
ABagley@crowell.com
KAber@crowell.com
RLesser@crowell.com

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on April 18, 2025, true and correct copies of the documents listed below were served on all counsel of record through the Court's CM/ECF system:

1. Defendant's Motion for Summary Judgment.

2. Memorandum of Law in Support of Defendant's Motion for Summary Judgment.

3. Defendant's Statement of Undisputed Material Facts and accompanying exhibits;

Dated:  April 18, 2025.


Respectfully submitted,


*/s/ Toni Michelle Jackson*
Toni Michelle Jackson

*Attorney for The Salvation Army, an Illinois nonprofit corporation*