**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

MICHAEL CLANCY, STUART LOVE,
THOMAS BRYANT, JAMES PETERS, and
SAMUEL PATTON, on behalf of
themselves and all others similarly
situated,

                Plaintiffs,

                v.

THE SALVATION ARMY, an Illinois
nonprofit corporation,

                Defendant.

No. 22 CV 1250

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

The Salvation Army runs rehabilitation centers throughout the Midwest. Enrollees in its program were required to stay sober, participate in counseling, and perform 40 hours per week of manual labor—something The Salvation Army called "work therapy." Plaintiffs are former enrollees in the rehabilitation program who allege that they were employed by The Salvation Army and thus covered by state and federal minimum wage and overtime laws. The Salvation Army, arguing that rehabilitation-program participants are not employees under either federal or state law, moves for summary judgment.

**I.      Legal Standards**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary

judgment, I view the facts and draw all inferences in the light most favorable to the nonmoving party. *Smith v. Kind*, 140 F.4th 359, 362, 364 (7th Cir. 2025); *Walters v. Professional Labor Grp., LLC*, 120 F.4th 546, 548 (7th Cir. 2024).

Whether a defendant is an employer under the Fair Labor Standards Act is fact-dependent but ultimately a question of law. *See Karr v. Strong Detective Agency, Inc.*, 787 F.2d 1205, 1206 (7th Cir. 1986); *see also Sec'y of Labor v. Lauritzen*, 835 F.2d 1529, 1535 (7th Cir. 1987).

## II.    Facts

The Salvation Army is a religious denomination and charitable organization. [279] ¶ 1.[1] Defendant here—The Salvation Army, an Illinois nonprofit corporation— administered, owned the assets, and ran the programs in the Central Territory (Illinois, Indiana, Iowa, Michigan, Minnesota, Missouri, Nebraska, and Wisconsin). [279] ¶¶ 2, 6.

The Salvation Army's Adult Rehabilitation Centers offered individuals struggling with substance abuse, unemployment, psychiatric issues, or homelessness a drug- and alcohol-free environment, housing, food, clothing, counseling, and 12-step programs at little or no monetary cost. [279] ¶¶ 4–5. Inability to pay for shelter or services was not a reason to turn someone away from an ARC. [279] ¶ 5. The Salvation Army advertised its Adult Rehabilitation Centers to people struggling with substance

---

[1] Bracketed numbers refer to entries on the district court docket. Page numbers are taken from the CM/ECF header placed at the top of filings. The facts are primarily taken from the parties' responses to the statements of material facts, [279], [294], where both parties' assertions and responses are set forth in the same document.

abuse as a 12-step, abstinence program designed to help them learn to stay clean. [294] ¶ 61.

While "beneficiaries"—the term used by The Salvation Army to refer to participants in the program—were enrolled in an ARC, The Salvation Army also provided them with a small weekly cash and canteen credit payment called a gratuity. [279] ¶ 3; [294] ¶ 4. Some participants were asked to turn over Supplemental Nutrition Assistance Program or food-stamp benefits to offset food costs. [279] ¶ 20.

The ARC program typically ran 180 days—but sometimes lasted up to 12 months—during which beneficiaries had to participate in religious services, counseling and classes, and perform "work therapy." [279] ¶¶ 8–15, 55–57; [294] ¶ 1. Participants were not allowed to leave the premises during the first thirty days of the program, work an outside job, or possess more than $60 in cash onsite. [294] ¶ 58. Upon completion of the program, participants celebrated with a graduation ceremony. [279] ¶¶ 9, 18. But most people did not complete the program. [279] ¶ 17. Some returned to try again, knowing the program requirements. [279] ¶¶ 16–17, 48.

The claims in this case revolve around participants who chose to enroll in ARCs; court-ordered participation is not at issue. *See Taylor v. Salvation Army Nat'l Corp.*, 110 F.4th 1017, 1022 (7th Cir. 2024) (describing distinction between voluntary enrollees and participants referred by courts). Generally, people enrolled in ARCs to get help with problems like homelessness, substance abuse or addiction, unemployment, and instability following release from incarceration or hospitalization. [279] ¶¶ 4, 22. For example, Michael Clancy first enrolled in an ARC

to secure shelter and get help for addiction. [279] ¶¶ 83–84. He re-enrolled twice. [279] ¶ 83. Thomas Bryant was a five-time ARC participant, motivated to enroll because he was homeless and wanted help for his addiction. [279] ¶¶ 98–99. Samuel Patton enrolled four times, seeking help with substance abuse and homelessness; he felt like the ARC was a sanctuary. [279] ¶¶ 101–02. As these plaintiffs' re-enrollment shows, attending an ARC did not guarantee sobriety or financial stability. [294] ¶ 60.

The Salvation Army premised its work therapy program on abiding by a work-structured day, with the aim of giving the participant a routine of productive activity and expectations for social behavior. *See* [279] ¶ 68. Beneficiaries were required to work assigned duties for up to eight hours a day, five days per week; and plaintiffs assert that beneficiaries were sometimes required to work more than that. [279] ¶ 76. The assignments included working in thrift stores, sorting inventory in warehouses, cleaning dormitories, kitchen duties, and clerical work. [279] ¶ 79. The Salvation Army assigned tasks based on the needs of the ARC and its thrift stores; participants could not choose their assignments. [294] ¶ 31.

The assignments required little training or experience and could be physically demanding. *See* [292] at 29–30. Although Salvation Army policies drew distinctions between the purpose of the work performed by its paid employees and ARC participants, *see* [292] at 24 & n.17, beneficiaries sometimes worked side-by-side with paid employees. [279] ¶ 81; [294] ¶ 29. The Salvation Army evaluated participants' work performance and productivity, and some ARC employees pushed productivity targets on beneficiaries. [294] ¶ 14. The plaintiffs did not ask to be paid a wage for

their work therapy assignments, but they suggest that the policies requiring work therapy established an expectation that the labor was in exchange for the housing, food, clothing, and rehabilitation services. [279] ¶ 45. The Salvation Army says work therapy "simulated" real-world work. [279] ¶¶ 75, 68. Plaintiffs say it was just work.

The Salvation Army did not pay a minimum wage to beneficiaries for their participation in work therapy. [294] ¶ 8. Its original mission, at its founding in England, was to provide social services to those facing poverty and addiction. [279] ¶ 1. Defendant's ARCs were spiritually based rehabilitation programs, not clinical treatment programs; it viewed its programming as an expression of its religious mission. [279] ¶ 10–11, 14–15. The Salvation Army believed that keeping beneficiaries busy (minimizing idle time) reduced the temptation of drugs, alcohol, or other vices. [279] ¶ 13. But it never assessed the therapeutic value of its ARC programming.[2] [294] ¶ 17. The work performed by ARC participants was not uniquely rehabilitative; other stable, paid employment could provide similar benefits to a person in dire straits. [294] ¶ 16. Plaintiffs' expert opined that The Salvation Army's work therapy was not an effective treatment for substance use disorders. [294] ¶ 20.[3]

The Salvation Army enforced a uniform set of behavioral rules. [279] ¶ 35. These rules included: staying sober; prohibitions on fighting and violent behavior;

---

[2] Work therapy was not the only rehabilitation model used by The Salvation Army. It also ran a program called Harbor Light, where participants did not work in thrift stores and received medication-assisted treatment. [294] ¶ 19.

[3] The Salvation Army points to historical practice from the U.S. Department of Veterans Affairs to support the notion that work therapy is a treatment method and not employment. [279] ¶¶ 71–74. While helpful background, the different facts and statutory question in this case make this history of work therapy immaterial.

required participation in all mandatory elements of the ARC program; following a dress code and grooming policy; a curfew; and keeping dormitories clean. [279] ¶ 35. The Salvation Army required ARC participants to make up missed work shifts, including in cases of medical emergencies, and schedule their counseling and other services around the work assignments. [294] ¶ 12; [279] ¶ 77.[4] Missed work therapy did not always lead to discharge, but it was grounds for dismissal from the program. [294] ¶¶ 10–12; [279] ¶¶ 38, 77 (describing progressive discipline). The parties dispute the weight given different violations of mandatory ARC rules, but there is no dispute that The Salvation Army's policies conditioned successful completion of ARC programming on participation in work therapy, church attendance, sobriety, and curfew and rule compliance. [279] ¶ 78. Work therapy was 40 hours per week, and other classes and activities took about 10 hours per week; but as a residential program, the ARC environment and its prohibition on drugs and alcohol (while difficult to enforce) was an around-the-clock experience for participants. [279] ¶ 110; [294] ¶ 38.

When a person enrolled in an ARC, they typically went through an intake process with an intake coordinator. [279] ¶ 26. Beneficiaries received the ARC rules during intake procedures, including in a Beneficiary Handbook. [279] ¶ 35; [259-3]. The Salvation Army's policies required sobriety upon intake, although some plaintiffs

---

[4] One plaintiff reported that when he needed surgery, the response was, "This is not an old folks' home. This is a business. And if you can't work, you can't be here." [294] ¶ 10. The Salvation Army points out that at times it offered sick passes and accommodations of temporary light-duty assignments. [294] ¶¶ 7, 10.

successfully enrolled even when not sober. [279] ¶ 27. Sober or not, upon intake the participants signed a Beneficiary Admittance Statement. [279] ¶ 28. The statement said ([279] ¶ 28, [259-55] at 6):

> I understand that The Salvation Army is a religious and charitable organization and that this Adult Rehabilitation Center is dedicated solely to the social and physical rehabilitation and spiritual regeneration of those persons who are in need of such assistance. I further understand that under no circumstances can this Center be under any obligation to me and that I am a beneficiary and not an employee of this Center. I understand that my admission and continued residence is dependent upon my needing such assistance and my willingness to help myself and others so situated, including the voluntary performance of such duties as may be assigned to me.

The parties dispute whether The Salvation Army made money or ran a deficit from its thrift-store operations. [279] ¶ 136; [294] ¶¶ 30, 35–36. But there is no dispute that the majority of the funds to run the ARCs came from the sale of donated goods. [279] ¶¶ 132–33. During the 2020 COVID-19 pandemic, The Salvation Army closed thrift stores, but ARC programming continued. [294] ¶ 36. Excluding 2020, plaintiffs calculate ARC revenue to exceed expenses. [294] ¶ 36. Between 2017 and 2023, ARC participants performed millions of hours of labor at The Salvation Army, comprising 26% of the workforce at its thrift stores. [294] ¶¶ 26–27. The parties dispute whether the ARC participants were needed to keep thrift stores open or whether the thrift stores were needed to keep ARC programming going. [294] ¶ 32.

## III.  Analysis

The central dispute here is whether The Salvation Army employed, within the meaning of the Fair Labor Standards Act, the participants in the Adult Rehabilitation Centers. The plaintiffs entered the program because they were

struggling with substance abuse, homelessness, or both, and The Salvation Army offered to help them. In the program, the plaintiffs performed unskilled labor for at least 40 hours a week. They had to follow rules and supervision when performing those tasks. They couldn't skip assignments at will. The Salvation Army's thrift stores used the labor to sell goods, generating cash to fund its programming (and drawing inferences in plaintiffs' favor, other interests and goals of The Salvation Army). Like many drug rehab programs, The Salvation Army's was not a cure.

The Fair Labor Standards Act imposes on all covered employers minimum wage and maximum hours requirements. 29 U.S.C. §§ 206, 207. "Every employer shall pay to each of his employees" the federal minimum wage. 29 U.S.C. § 206(a). Likewise, "no employer shall employ any of his employees … for a workweek longer than forty hours unless such employee receives" one and one-half times his regular wage for the hours worked beyond forty. 29 U.S.C. § 207(a)(1). To prevail on a claim arising under either of those provisions, the plaintiff must prove that he was an employee. *Brant v. Schneider Nat'l, Inc.*, 43 F.4th 656, 664 (7th Cir. 2022).

Under the Act, an "employee" is "any individual employed by an employer," an "employer" is "any person acting directly or indirectly in the interest of an employer in relation to an employee," and "employ" includes "to suffer or permit to work." 29 U.S.C. § 203; *Brant*, 43 F.4th at 664 (the definitions are "both broad and circular"). The breadth is intentional, as "Congress designed the FLSA to reshape the economy to avoid the economic and social ills caused by low pay and long hours for workers." *Brant*, 43 F.4th at 665 (7th Cir. 2022); *see also United States v. Rosenwasser*, 323 U.S.

8

360, 362 (1945) ("A broader or more comprehensive coverage of employees within the stated categories would be difficult to frame."). Interpretive tools like looking to dictionaries for the meaning of "employee" are unhelpful. *See Goldberg v. Whitaker House Co-op., Inc.*, 366 U.S. 28, 33 (1961) (under the Fair Labor Standards Act, "'economic reality' rather than 'technical concepts' is to be the test of employment").

"The conclusion of whether an individual qualifies as an employee under the Act requires an examination of the totality of the circumstances, with the ultimate goal of determining the 'economic reality of the working relationship.'" *Simpkins v. DuPage Hous. Auth.*, 893 F.3d 962, 964 (7th Cir. 2018) (quoting *Vanskike v. Peters*, 974 F.2d 806, 808 (7th Cir. 1992)).

Courts sometimes use multi-factor tests to assess the employment relationship. *See, e.g., Estate of Suskovich v. Anthem Health Plans of Va., Inc.*, 553 F.3d 559, 565–66 (7th Cir. 2009); *Lauritzen*, 835 F.2d at 1534–35. While those tests can be helpful, they should not be applied when "they 'fail to capture the true nature of the relationship' between the alleged employee and the alleged employer." *Berger v. Nat'l Collegiate Athletic Assn.*, 843 F.3d 285, 291 (7th Cir. 2016) (quoting *Vanskike*, 974 F.2d at 809).[5]

---

[5] The control exerted over the conditions of work is often a consideration, but ill-suited to the kind of program at issue here. The prison–prisoner relationship is distinguishable, *see Clancy v. Salvation Army*, No. 22 CV 1250, 2023 WL 1344079, at *4 n.8 (N.D. Ill. Jan. 31, 2023), but serves as a reminder that "control" illuminates the economic reality of more traditional bargains (as in independent contractor scenarios). *See Vanskike*, 974 F.2d at 810. Alternative arrangements that sit within a multi-faceted relationship, like students working within an academic setting, ultimately require a program-specific judgment based on general principles not checklist tests. *See Hollins v. Regency Corp.*, 867 F.3d 830, 835–37 (7th Cir. 2017).

Another way to decide whether a relationship is one of employer–employee is to consider four subsidiary questions or issues. One: whether plaintiffs or The Salvation Army were the primary beneficiary of the relationship. *See Walling v. Portland Terminal Co.*, 330 U.S. 148, 152 (1947) (an employee cannot be one who works only to serve his own interest); *Vaughn v. Phoenix House New York Inc.*, 957 F.3d 141, 145–46 (2d Cir. 2020). Two: whether the worker had any expectation of compensation. *See Tony and Susan Alamo Foundation v. Secretary of Labor*, 471 U.S. 290, 301 (1985); *Berger*, 843 F.3d at 293. Three: how dependent the plaintiffs were on The Salvation Army throughout the relationship. *Brant*, 43 F.4th at 665; *Alamo Foundation*, 471 U.S. at 301. And four: how the relationship maps onto the purposes of the FLSA—achieving minimum labor standards and preventing unfair competition. *See* 29 U.S.C. § 202; *Vanskike*, 974 F.2d at 810. These four issues are interrelated and not standalone inquiries. *See Vaughn*, 957 F.3d at 145–46 (to decide who is the primary beneficiary, courts evaluate expectation of compensation); *see Alamo Found.*, 471 U.S. at 301 (referencing dependency and expectation of compensation together).[6]

Plaintiffs focus on the provision of labor at thrift stores (and other ARC-related assignments, like working in warehouses or staffing the reception desk at an ARC).

---

[6] In *Williams v. Strickland*, 87 F.3d 1064, 1068 (9th Cir. 1996), the court held that a participant in The Salvation Army's Adult Rehabilitation Center was not an employee under the Fair Labor Standards Act. Although that case concerned the same program and applied the same key Supreme Court precedents on the economic reality of employer–employee relationships, it was necessarily decided on a different record and is not binding here. *See Hollins*, 867 F.3d at 837 ("These cases normally turn on the facts of the particular relationship and program, and so we should not be understood as making a one-size-fits-all decision….").

The Salvation Army urges a broader context, looking at the entire relationship created by enrollment in an ARC, to include counseling, religious services, food, shelter, and the stated purpose of the program: to render aid to the needy. Courts often speak of the economic reality of "the working relationship." *Vanskike*, 974 F.2d at 808. But understanding the "working" relationship is not limited to considering only the labor for which plaintiffs seek compensation. As with prisoners or student-athletes, the assessed reality must account for the context of how plaintiffs and The Salvation Army relate to each other. *See Vanskike*, 974 F.2d at 809–10 (considering the complete relationship between prison and prisoner); *Berger*, 843 F.3d at 291 (long-standing tradition of amateurism defines the economic reality of the relationship between student athletes and their schools). I look at plaintiffs' entire relationship with The Salvation Army to assess its economic reality.[7]

The Salvation Army required work as a condition of entry in and continued shelter at its Adult Rehabilitation Centers. While that work took up most of the participants' time, it was part of a rehabilitation package offered by The Salvation Army. Plaintiffs have plenty of evidence that it was not a good rehabilitation program—"work therapy" was not a clinically tested method of overcoming substance

---

[7] In *Eberline v. Douglas J. Holdings, Inc.*, 982 F.3d 1006, 1013–14 (6th Cir. 2020), the court looked to the educational context of plaintiffs' work to decide that the court's test for evaluating training or educational programs applied. It then held that the application of its test for training programs must be targeted at the segment of the relationship for which plaintiffs sought compensation. Unlike the discrete tasks assigned cosmetology students, the economic reality of "work therapy" at The Salvation Army cannot be disaggregated from the entire relationship between participants and ARCs. At the same time, there are no other tasks or work at issue here, so assessing the economic reality of ARC programming generally is not a material analytical difference from *Eberline*.

abuse, many plaintiffs dropped out or could not maintain sobriety and stability after leaving the program, and the work assignments were simply menial tasks with no educational or vocational training to equip participants for advancement outside the walls of the ARC. The Salvation Army ran the program at a large scale and the program depended on revenue generated by thrift stores staffed by vulnerable plaintiffs. But that scale coupled with poor quality or efficacy of the program does not suggest an alternative economic reality to the objective bargain between plaintiffs and The Salvation Army. The bargain was a specific rehabilitation program, not employment under the FLSA.

When evaluating the primary beneficiary of the relationship, and viewing the facts in plaintiffs' favor, one could conclude that The Salvation Army got more out of the arrangement than any individual plaintiff. It tapped a resource to staff its thrift stores, generating revenue with lower labor costs. Plaintiffs have marshaled a record to suggest that the benefit of staffing thrift stores and related ARC functions tilted toward The Salvation Army.

On the other hand, there is no dispute that the rehabilitation program was offered as a packaged benefit to participants, who were under no obligation to participate and who wanted the kind of help extended by The Salvation Army. During the pandemic, shuttered thrift stores did not stop ARC programming, which suggests that filling ARC beds to get thrift-store labor was not an accurate description of the relationship. More like trainees learning skills, prisoners getting out of their cells, or students paying for experiential learning, ARC enrollees gained access to much-

12

needed, personally beneficial services by agreeing to the program. Given the scale of The Salvation Army's operation, a fact finder could conclude that any one unhoused, unemployed, indigent plaintiff struggling with addiction benefited from an ARC more than The Salvation Army benefited from their work for a few months (especially since success was far from guaranteed and early departures were frequent). But that conclusion about the direction of net gains is not compelled by the record here.

That plaintiffs have raised a genuine dispute over who stood to gain more does not preclude summary judgment for The Salvation Army. The economic reality is a mix of considerations. Expectation of compensation and economic dependency are part of that mix, and in this case, decisive.

Labels, however, are not dispositive. So when plaintiffs signed statements acknowledging that they were not employees or when Salvation Army managers occasionally referred to a plaintiff as an employee, [279] ¶¶ 39, 41, neither piece of evidence resolves whether plaintiffs expected compensation for their labor. *See Alamo Found.*, 471 U.S. at 300–01 (sincere testimony that workers did not expect compensation was not dispositive); *Brant*, 43 F.4th at 665 (the terms of a contract do not control the employer-employee issue). But no fact finder could infer an objective expectation of compensation here. Plaintiffs argue that the work was in exchange for compensation in the form of in-kind benefits (housing, food, clothing, etc.) but from the jump, work therapy was necessarily understood to be part of The Salvation Army's free rehabilitation program. The offer was not food, shelter, and counseling in exchange for work, but a one-sided packaged residential rehabilitation program that

13

filled the day because of The Salvation Army's belief that idle time led to vice. That was what plaintiffs accepted. Whether plaintiffs truly bought into that programmatic philosophy, and whether the program was a good one, plaintiffs knew how the work assignments fit into the program and they knew those assignments were an integral piece of it. While reenrollment could suggest that the program was not a good way to achieve stable sobriety, it indisputably establishes that returning participants did not expect compensation because they knew the program's terms. More like the student athlete who worked hard on a voluntary activity, *Berger*, 843 F.3d at 293, plaintiffs participated in a context of rehabilitation that could not create an expectation of compensation. *See also Taylor*, 110 F.4th at 1031 (describing the program's voluntary components, where both sides were free to stop participating).

The *Alamo Foundation* workers staffed a vast commercial enterprise of service stations, retail stores, hog farms, roofing and electrical construction companies, a recordkeeping company, a motel, and a candy company. *Alamo Found.*, 471 U.S. at 292. They received food, clothing, shelter, and other benefits from the defendant employer, but no cash salaries. *Id.* They were "entirely dependent" on the employer for "long periods, in some cases several years." *Id.* at 301. Although ARC enrollees received similar benefits, the dependency here is different. The goal of The Salvation Army's program was to have plaintiffs exit the program, not capture them indefinitely for either its religious mission or its commercial enterprise. Participants could not leave for 30 days, could not work outside jobs, could not keep much cash on hand, and had no say on their assignments. The work could be demanding. But this was not

14

economic dependency because participants could leave (even within the first 30 days) if they did not or could not follow through with the program's requirements, and The Salvation Army wanted them to leave. Graduation was the goal for both sides. The economic reality in *Alamo Foundation* reflected individual workers generating income for a commercial enterprise and their conversion from independent actors into dependent members of an entity. In turn, the employer held onto those laborers and prevented them from accessing other economic opportunity. Notwithstanding subjective protestations to the contrary, the objective reality confirmed that the workers expected to perform labor in exchange for in-kind benefits. There was no other objective expectation that made sense. Not so here. The surface similarities—working unskilled jobs for a religious organization that recruited from vulnerable populations—omit the key distinction: the temporary, voluntary rehabilitation program was designed for and accepted the participant's independence and there is no factual dispute that separation was both intended and frequent. Even assuming the program was not a good method of treating substance abuse disorders and that The Salvation Army gained more than a beneficiary received, it did not create an expectation of compensation or economic dependency.

The term "employee" in The Fair Labor Standards Act was "given 'the broadest definition that has ever been included in any one act.'" *Rosenwasser,* 323 U.S. at 363 n.3, quoting from Sen. Hugo Black, the Act's sponsor, 81 Cong.Rec. 7657 (1937). The purpose of the Act is to correct labor conditions detrimental to a minimum standard of living necessary for the well-being of workers and to prevent unfair competition

15

from the use of underpaid labor. 29 U.S.C. § 202(a). Concern over coercion and using superior bargaining power to reap the benefits of "voluntary" work runs through the Act. *See Alamo Found.*, 471 U.S. at 302. The plaintiffs fueled The Salvation Army's thrift-store enterprise, and The Salvation Army controlled the terms of assignments. But in the end, when understood as a temporary, voluntary rehabilitation program, the relationship here was not exploitative in the FLSA-sense, preventing plaintiffs from accessing a minimum standard of living. The Salvation Army did not force enrollment, plaintiffs understood the program, they were free to seek help elsewhere, and The Salvation Army put up no barriers to exit. Goodwill and The Salvation Army ran competing thrift stores but not competing rehabilitation centers. [294] ¶¶ 69–70. There's no reasonable inference available to suggest that plaintiffs' unpaid labor gave The Salvation Army an unfair competitive advantage over Goodwill.

The economic reality was not an employer–employee relationship under the FLSA.

Plaintiffs also bring claims under Illinois, Michigan, and Wisconsin minimum wage laws. [160]. Clancy, Love, and Bryant bring individual claims for failure to pay overtime as required by state law. [160]. Under Illinois and Michigan law, the test for employment relationship is identical to the test under federal law, and the conclusion here applies equally to those claims. *Callahan v. City of Chicago*, 78 F.Supp.3d 791, 821 (N.D. Ill. 2015), aff'd, 813 F.3d 658, 660 (7th Cir. 2016); *Allen v. Lincare Inc.*, No. 16-CV-11996, 2018 WL 352362, at *8 n.2 (E.D. Mich. Jan. 10, 2018) (citing *Dikker v. 5-Star Team Leasing*, 243 F.Supp.3d 844, 854 n.3 (W.D. Mich. 2017)).

16

Wisconsin law does not strictly mirror the federal standard. *See Brant*, 43 F.4th at 673 (observing that "the definitions of employer and employee are distinct under the FLSA and Wisconsin law"). Wisconsin law defines "employer" as a person having control of a person employed at any labor. Wisc. Stat. § 104.01; *Brant*, 43 F.4th at 673. The statute does not limit "control" to the issues of distinguishing independent contractors from employees. But Wisconsin courts also look to interpretations of the Fair Labor Standards Act in settings for which control would otherwise be overwhelming and dispositive. *E.g.*, *State ex rel. Hung Nam Tran v. Speech*, 324 Wis.2d 567, 575, 782 N.W.2d 106, 111 (2010) (minimum wage protections not necessary to protect the well-being and standard of living for persons civilly committed) (citing *Sanders v. Hayden*, 544 F.3d 812, 814 (7th Cir. 2008)). Civilly committed persons, like prisoners, present a different scenario than plaintiffs here. But the control exercised by The Salvation Army within the relationship created by a voluntary rehabilitation program is not the kind of control that suggests employment, and I predict the Wisconsin Supreme Court would interpret the statute consistently with the Fair Labor Standards Act when assessing whether The Salvation Army was an employer of these plaintiffs. For the same reasons I conclude that The Salvation Army was not plaintiffs' employer under the FLSA, I conclude that it was not their employer under Wisconsin's minimum-wage law.

## IV.    Conclusion

The Salvation Army ran thrift stores and staffed those stores in substantial part with people who participated in The Salvation Army's residential rehabilitation program, without paying them a minimum wage. Although the scale of the operation

17

and its arguable ineffectiveness as therapy could look like plaintiffs worked a job like any other, the economic reality is to the contrary. The relationship between plaintiffs and The Salvation Army was not employee–employer; plaintiffs were independent actors who did not reasonably expect compensation when participating in the temporary program of rehabilitation services offered by The Salvation Army. Defendant's motion for summary judgment, [256], is granted. Enter judgment in favor of defendant and terminate civil case.

ENTER:

_____

Manish S. Shah
United States District Judge

Date: 3/31/2026

18